VINCENT FINOLI AND HELEN FINOLI, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15845-82, 15915-82.  Filed April 16, 1986.

*Thomas Gelb, Stern Katlowitz,* and *Moshe Katlowitz,* for the petitioners.

*Anne Hintermeister,* for the respondent.

KORNER, *Judge*: In these consolidated cases, respondent determined deficiencies in Federal income tax against petitioners as follows:

| TYE Dec. 31— | Deficiency |
| --- | --- |
| 1976 | $32,481.76 |
| 1977 | 16,633.00 |
| 1978 | 27,725.36 |
| 1979 | 26,426.88 |

After concessions, the issues presented for decision are: (1) Whether petitioners are entitled to deductions claimed as their distributive share of the losses of Brooksville Properties, a New Jersey limited partnership, for the years in issue; and (2) whether petitioners are entitled to an investment tax credit, representing their distributive share of the investment tax credit claimed by Brooksville Properties, for their taxable year 1976.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulations of facts, and exhibits attached thereto are incorporated herein by this reference.

Vincent Finoli (Vincent or petitioner) and Helen Finoli (Helen) were husband and wife and residents of Greensburg, Pennsylvania, at the time the petitions herein were filed. Vincent and Helen (hereinafter referred to, collectively, as petitioners) timely filed joint Federal income tax returns for their taxable years 1976, 1977, and 1978,[1] using the cash receipts and disbursements method of accounting. During the years in issue, Vincent was a business executive and Helen was a housewife.

On June 24, 1971, the city commission of the city of Brooksville, Hernando County, Florida, passed and adopted Ordinance No. 148, granting to Hernando Cable TV, Inc., a nonexclusive franchise to construct, maintain, and operate a cable television transmission system in the city of Brooksville, Florida. On September 7, 1971, the Board of County Commissioners of Hernando County, Florida, adopted a resolution granting a nonexclusive franchise to Hernando Cable TV to construct, maintain, and operate a cable television transmission system in the county of Hernando, Florida. The city ordinance provided that the rights granted thereunder were to continue for a period of 20 years from the date of its adoption, until 1991, and that the franchise could not be transferred to another person or corporation without prior approval of the city commission by resolution. The county resolution provided that the rights granted thereunder were to continue for 25 years

---

[1] All issues pertaining to petitioners' taxable year 1979 have been settled by the parties.

from its adoption, until 1996. Both the ordinance and the resolution granted Hernando Cable TV priority over any others in renegotiating a renewal of the franchises. Notice of intent to enter into renewal negotiations was to be given to the other party by either party at least 90 days and not more than 6 months prior to the expiration of the franchises.

Prior to November 1976, BFM Constructors, Inc. (BFM) acquired the franchises, equipment, and subscriber list comprising a community antenna television (CATV) system located in Brooksville, Florida, and certain parts of unincorporated Hernando County contiguous to Brooksville, from Hernando Cable TV. On November 15, 1976, the city commission of the city of Brooksville, Florida, adopted Resolution No. 443, approving the assignment of the nonexclusive franchise originally granted to Hernando Cable TV on June 24, 1971 to BFM "and its nominee" Brooksville Properties (Brooksville). None of BFM's officers and directors had prior experience in the CATV industry.

Morris Cofman, an accountant, wanted to get into the CATV industry. He approached Jack Isaacson in early 1976. Isaacson was associated with BFM, seeking out potential purchasers for its CATV systems. Isaacson located a CATV system in the city of Brooksville and certain parts of Hernando County, that was ultimately purchased by Cofman on behalf of Brooksville.

### The Alron Report

Jack Scheinman of Alron Communications, Inc. (Alron), was recommended to Cofman by Isaacson as an expert in the CATV systems field qualified to evaluate the CATV system being offered by Isaacson. Scheinman prepared an appraisal report of the CATV system located in Brooksville City and parts of Hernando County, Florida, dated November 30, 1976. It was assumed in the 4-page report submitted by Scheinman that there were 4,000 houses in the franchised area; it was also stated that:

The price to be paid in total of over $1,300,000 is at the upper level of assessment for similar systems, but in order to retain a balance, we must understand that the long-range pay outs, interest rates, and, acceptable

inherent lack of total definition of acquiring what somebody else built, makes the price not unreasonable.

The report stated that the system was in operation in the franchised area. It also stated that "Considering the man-hours needed, and the cycle for delivery of material and the preparatory work already seemed to have been done, the System should probably be well begun and a substantial portion able to be operational, certainly within the next several months." The report did not state the basis for its conclusions, nor did it contain any projection of revenues, income, expenses, profits, or number of subscribers.

Scheinman was Alron's only employee. He. prepared appraisal reports for other partnerships engaged in transactions with BFM. Scheinman did not have any clients other than such partnerships. Scheinman's son, Alan, was the president and chairman of the board of S.A.L. Communications, a distributor of CATV systems components, selling components to systems which were managed by BFM.

Brooksville was a New Jersey limited partnership, formed for the purpose of acquiring and exploiting the CATV system located in Brooksville, Florida, and certain parts of unincorporated Hernando County contiguous to the city of Brooksville, and operated under franchises granted by the town council of the city of Brooksville and the Hernando County Board of Commissioners. The geographic area covered by the CATV system was located approximately 60 miles north of Tampa, Florida.

*The Confidential Memorandum*

A confidential memorandum, dated November 5, 1976, explaining the transactions to be entered into by Brooksville and a legal opinion explaining the tax consequences of the said transactions were prepared and used to obtain limited partners. The memorandum stated that upon completion of the offering, Brooksville was to enter into agreements:

(1) With BFM (a) to acquire all of the equipment used in the CATV system, (b) to assign the franchises to Brooksville, (c) to obtain a warranty on the equipment, and (d) to acquire the list of subscribers to the CATV system;

(2) With North County Financial Corp. (NCF), an affiliate

of BFM, to provide for certain financing in connection with the CATV system; and

(3) With Brooksville Cable Management Co. (BCM), to provide for the management of the CATV system.

According to the memorandum, Brooksville was to pay BFM $860,000 for the equipment and $75,000 for the subscriber list. NCF was to loan $495,000 to Brooksville. None of the loan proceeds were to be drawn in 1976, $343,000 were to be drawn in 1977, and the $152,000 balance in 1978. Assuming the sale of all of the limited partnership units and the contribution of the general partner ($1,000), the gross contributions to be received by the partnership would amount to $491,000.

Barry Feiner, an attorney who was introduced to Cofman by a Mr. Bass, assisted in preparing the confidential memorandum. Mr. Bass sold partnership interests in Brooksville on a commission basis. Feiner also assisted in preparing the documentation in connection with the acquisition of the CATV system by Brooksville and other ancillary agreements. Feiner was counsel to other limited partnerships which acquired CATV systems from BFM, including Glendora Enterprises, Pasco Associates, and Monrovia Associates.

The memorandum warned prospective limited partners that "The partnership is purchasing all of its assets from and entering into all of its agreements with BFM Constructors, Inc. or affiliates thereof [and] As a result, BFM Constructors, Inc. will make a substantial profit," and that "In view of the significant risk factors disclosed herein, the purchase of limited partnerships should be considered only by persons who can afford a total loss of their investment." Sales of limited partnership units were to be made only to persons meeting certain minimum standards of income and net worth, viz, taxable income, some portion of which was to be subject to Federal income tax at a rate of 50 percent or more, and net worth, exclusive of home, furnishings, and automobiles, in excess of $150,000.

The memorandum disclosed that BCM, the affiliate of BFM that was to manage the system, was to be organized as a limited partnership, and that the officers and directors of the two corporations that were to own BCM, BFM, and S.C.

Orlicki, Inc., did not have significant experience with respect to the operations of CATV systems. It was represented that Rufus Ross would be employed by BCM as project manager of the CATV system, and that he was experienced in the operation of CATV systems. It was noted, however, that the principals and employees of BCM, including Ross, were active in the management of other CATV systems and had commitments to manage additional systems, some of which were or would be located in the Hernando County area. It was represented that BFM was attempting to increase BCM's staff "in order to meet its expanding managerial commitments but no assurance can be given that it will be successful. *Accordingly, Manager [BCM] may not have the capacity to adequately manage the system.*"

The general partner of Brooksville was to be Cofman, who would devote only so much of his time to the partnership business as would, in his judgment, be reasonably required. Cofman's conflicts of interest in allocating management time, services, and functions between Brooksville and other business ventures or partnerships were disclosed. Cofman was the general partner of two other limited partnerships, Mildale Associates and Rialto Properties, which acquired assets from BFM. Mildale and Rialto suffered substantial losses.

Probable conflicts of interest regarding the legal representation of Brooksville and Cofman by the same counsel in connection with tax matters and other matters dealing with the preparation of the offering were also disclosed. The memorandum further stated that Cofman had had no experience in evaluating, acquiring, owning, or leasing CATV systems, and thus would be required to depend upon the advice of independent consultants for the technical background required to evaluate the economic viability of the CATV system and BCM's performance as manager.

Cofman was to contribute $1,000 of capital to Brooksville, and was to receive $67,500 in 1976, $1,000 in 1977, and $2,000 in 1978 and thereafter, as management fees. In addition to the foregoing amounts, Cofman was to receive an aggregate of 2 percent of the net income, net loss, and distributions of Brooksville, and 40 percent of the residual proceeds (as defined in the partnership agreement) resulting from the refinancing and/or sale of Brooksville's property.

It was represented in the memorandum that Brooksville's properties, including the equipment, subscriber list, and franchises, would secure its debt obligations in the amount of $860,000. This debt was to increase to $1,355,000 by the end of 1978, and had to be serviced in order to prevent foreclosure and loss of any property securing such debt. It was stated that (1) the CATV system had been in existence for approximately 15 months and passed approximately 4,000 homes, (2) as of October 31, 1976, the CATV system had approximately 850 subscribers, or a saturation rate of 21 percent, and (3) that the system carried six commercial stations and one educational station, all of which could be obtained "off-air" (without the use of the cable) with quality somewhat poorer than that obtained by the use of the cable. BCM intended, according to the memorandum, to import two additional signals through the use of microwave transmission—Channel 17 of Atlanta, and Channel 6 of Miami—and could institute a form of pay television and engage in increased promotional and advertising activities, but no assurances were given that such activities would cause any meaningful increase in the number of subscribers to the CATV system. Moreover, no representation was made that BCM would build a microwave station. The CATV system's ability to obtain pay television and/or the Atlanta and Miami channels was contingent on building a microwave station. It was also stated that BCM intended to raise the monthly subscriber rate from $5 to $7.50, provided it could obtain approval for the raise from the municipalities in which the system was located, and that no assurance could be given that such raise would not cause a significant number of subscribers to terminate their subscriptions. Potential limited partners were forewarned that (1) the CATV system's operations did not generate sufficient revenue to cover its expenses, and (2) that unless the system could attain a saturation rate of approximately 42 percent based on a monthly subscriber rate of $7.50, or approximately 72 percent based on present monthly subscriber rates, the system's operations would not generate sufficient revenue to cover its expenses and the debt service.

There were approximately 3,291 houses in the franchised area in 1976. The historical industry average for basic cable

penetration— the ratio of basic service subscribers to total available subscribers— is approximately 50 percent.

The memorandum stated that (1) BFM was building or had committed itself to build two CATV systems in Hernando County, in an area covered by one of the franchises to be acquired by Brooksville, (2) an affiliate of BFM was licensed to operate another CATV system located in the franchised area, and (3) that "although the Franchise to be acquired by the Partnership will permit the Partnership to operate a CATV system in these areas, as a practical matter, the Partnership will be precluded from doing so because of the prior existence of the systems that BFM will build and/or manage."

BFM and BCM's personnel were active in the management of other CATV systems. BFM was obligated to provide deficit financing to other systems.

During the term of the management agreement, BCM was to be obligated to provide Brooksville with sufficient funds to cover any deficits resulting from the operations of the system and debt service. BCM was to be capitalized with $50,000. Potential limited partners were forewarned that BCM "may not have sufficient assets to fulfill this commitment." The memorandum stated that: "Since Manager [BCM] is a limited partnership, BFM, the General Partner thereof, will also be liable for this commitment," but apprised potential investors that BFM was similarly obligated with respect to a number of other systems and that as a result thereof, no assurance could be given that BFM would be in a position to honor its commitment to the partnership.

The projections contained in the confidential memorandum were based in part upon the availability of pay television or "Home Box Office"— which would offer recently released films, live night club shows, sports events, and similar entertainment programs not otherwise available to television viewers—to the subscribers. The estimate shown on page 705 of partnership revenues and expenses for the years 1976 through 1983 was provided.

The confidential memorandum stated that the remaining balance of Brooksville's debt, secured by the equipment, subscribers list, and franchises, was to become due and payable in 1988. Should Brooksville be unable to refinance

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|---|---|
| *Revenues* | | | | | | | | |
| Number of subscribers | 800 | 1,600 | 2,500 | 3,000 | 3,300 | 3,600 | 3,900 | 4,200 |
| Subscription income | $12,000 | $144,000 | $225,000 | $270,000 | $297,000 | $324,000 | $351,000 | $378,000 |
| Pay TV income | 1,200 | 57,000 | 90,000 | 108,000 | 119,000 | 130,000 | 140,000 | 151,000 |
| Operating revenues | 13,200 | 201,000 | 315,000 | 378,000 | 416,000 | 454,000 | 491,000 | 529,000 |
| *Expenses* | | | | | | | | |
| Management fee | 35,000 | 70,000 | 70,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Organizational costs | - - - | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | | |
| Guaranteed payment | 66,500 | 1,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Warranty fee | 20,000 | 100,000 | 100,000 | | | | | |
| Noncompetition fee | 45,000 | 45,000 | 45,000 | | | | | |
| Promotion and advertising | 85,000 | 125,000 | | | | | | |
| Interest | 8,600 | 62,000 | 77,000 | 81,000 | 78,000 | 73,000 | 66,000 | 58,000 |
| Operating expenses | 62,600 | 141,000 | 173,000 | 167,000 | 170,000 | 181,000 | 190,000 | 200,000 |
| Depreciation | 30,700 | 177,700 | 139,600 | 88,100 | 88,100 | 88,100 | 88,100 | 73,600 |
| Amortization of subscription list cost | 25,000 | 25,000 | 25,000 | | | | | |
| Tax advice | 10,000 | | | | | | | |
| Consulting fees | 10,000 | | | | | | | |
| Total expenses | 398,400 | 749,000 | 633,900 | 380,400 | 380,400 | 386,400 | 386,100 | 373,600 |
| Net profit (loss) | (385,200) | (548,000) | (318,900) | (2,400) | 35,600 | 67,600 | 104,900 | 155,400 |
| Investment tax credit | 10,000 | | | | | | | |

the debt or otherwise obtain funds to repay the debt, Brooksville would lose the equipment, franchises, and CATV system due to foreclosure.

A proposed limited partnership agreement to be entered into by Cofman, as general partner, and each of the limited partners was prepared, but was not executed.[2]

## The Tax Opinion

Allan T. Cannon, a New York attorney, prepared, at Cofman's request, the tax opinion explaining the Federal income tax consequences to Brooksville and its partners in connection with the acquisition of the franchises to operate the CATV system in Hernando County, Florida, the acquisition of the equipment and cable network used to operate the system, the subscribers list, the noncompetition agreement, and the agreement with BCM for the management of the CATV system. Feiner recommended that Cofman retain Cannon to write the tax opinion. The tax opinion, dated November 5, 1976, was based on the representations made on the confidential memorandum, the proposed partnership agreement, and other agreements and contracts pertinent to the transactions to be entered into by Brooksville, BFM, BCM, and/or NCF, and meetings with individuals involved with Brooksville. Cannon wrote tax opinions for several other partnerships which acquired CATV systems from BFM and retained BCM as their manager.

## The Agreements

On December 7, 1976, BFM and Brooksville executed the following documents: (1) Franchise agreement; (2) equipment agreement; (3) promissory note; (4) loan agreement; (5) management agreement; (6) subscriber agreement; (7) warranty agreement; (8) security agreement; and (9) noncompetition agreement.

Pursuant to the terms of the franchise agreement, BFM, as seller, sold, assigned, transferred, and delivered to Brooksville, as purchaser, all of its right and interest in the franchises for the sum of $25,000. The fair market value of

---

[2]The parties have nevertheless stipulated that the Brooksville Properties partnership was formed as described.

the franchises did not exceed $93,550, as of December 7, 1976.[3]

Under the provisions of the equipment agreement, BFM transferred all of the tangible components used in the operation of the CATV system to Brooksville. The purchase price of $860,000 was to be paid as follows: a $35,000 cash downpayment, and a promissory note in the amount of $825,000. The promissory note, dated December 7, 1976, provided for payments of principal and interest, at an annual rate of 6 percent, as follows:

| Date | Principal | Interest |
|------|-----------|----------|
| 1976 | 0 | Interest only at 6 percent |
| 1/2/77 | 0 | Interest only at 6 percent |
| 1/2/78 | 0 | Interest only at 6 percent |
| 1/2/79 | $50,000 | Together with interest at 6 percent |
| 1/2/80 | 84,000 | Together with interest at 6 percent |
| 1/2/81 | 113,000 | Together with interest at 6 percent |
| 1/2/82 | 114,000 | Together with interest at 6 percent |
| 1/2/83 | 176,000 | Together with interest at 6 percent |
| 1/2/84 | 117,000 | Together with interest at 6 percent |
| 1/2/85 | 106,000 | Together with interest at 6 percent |
| 1/2/86 | 0 | Interest only at 6 percent |
| 1/2/87 | 0 | Interest only at 6 percent |
| 1/2/88 | Balance of principal | Together with interest at 6 percent |

No payments of principal were ever made by Brooksville with respect to the note.

The equipment was purchased by BFM at a price substantially below what Brooksville agreed to pay BFM for the equipment. The value of the equipment did not exceed $406,645, as of December 7, 1976.[4] The equipment was

---

[3]Determined as follows:

| Number of homes passed (as of Dec. 7, 1976) 1,871 | × | $50 per home passed | = | $93,550 |

[4]Determined as follows:

| Antenna and headend and site equipment | $70,000 |
| Distribution system — amplifier and trunk lines, smaller distribution cables and distribution amplifiers and drop wires comprising 37 miles × $8,000 per mile | 296,000 |
| Drops in place — 739 subscribers × $55 per subscriber | 40,645 |
| | 406,645 |

subject to a $200,000 lien in favor of Jerrold Electronics Corp. (Jerrold) to secure a debt of BFM in that amount.

In order to finance the payment of certain fees, operating expenses, and interest costs payable to BFM in the early years of operations, Brooksville contracted to borrow, on a nonrecourse basis, the sum of $495,000 from NCF, an affiliate of BFM, payable, interest only, at 6 percent per annum payable every second day of January, with principal payable in full in 1988.[5] According to the loan agreement, the loan was to be disbursed to Brooksville as follows: $343,000 on January 2, 1977, and $152,000 on January 2, 1978. The loan agreement provided that Brooksville was to give 5 days written notice to NCF should it desire to obtain advances at the end of which period NCF would advance the requested funds to Brooksville. The advances required to be made were to be evidenced by promissory notes. No notes or copies of notes prepared or executed pursuant to the terms of the loan agreement could be located by Brooksville or by petitioners.

Brooksville entered into a management agreement with BCM. BCM was a Connecticut limited partnership consisting of BFM as the general partner and S.C. Orlicki, Inc., a corporation owned by Samuel Rosegarten, as limited partner. Orlicki acted as a finder or broker in connection with the organization, promotion, and initial transactions involving Brooksville, in return for which services it was given a 50-percent equity interest in BCM. BCM's business, as stated in its certificate of limited partnership executed December 7, 1976, was to manage and operate a CATV system in Brooksville and portions of Hernando County, Florida. BCM's existence was to terminate on May 31, 1997. Each partner was required to contribute $25,000 to BCM, for a total capitalization of $50,000.

Pursuant to the terms of the management agreement, Brooksville gave BCM the sole and exclusive right to operate and maintain the CATV system and to transact all business relating to the system in its own name or in Brooksville's name. The term of the management agreement was from December 7, 1976, to December 31, 1988. BCM, as

---

[5]The parties stipulated an annual rate of interest of 8 percent. We note, however, that the loan agreement in evidence provides for an interest rate of 6 percent.

manager of the CATV system, was obligated to: (1) Service all subscribers to the system, (2) pay, on Brooksville's behalf, any and all expenses and costs relating to the operation of the CATV system, (3) maintain the equipment in good repair, and (4) comply with the provisions of the franchises and not to violate the ordinances granting such franchises nor any existing local laws and governmental regulations. In consideration for its services, BCM was to receive the following compensation:

(1) For 1976 - $35,000;

(2) For 1977 and 1978 - $70,000 in each year, payable on the second day of January of each year;

(3) 1979 and after - 90 percent of gross revenues if such revenues exceeded $250,000. BCM was obligated, however, to pay, on Brooksville's behalf, all of the operating expenses of the CATV system, including debt service, viz, interest and principal, to BFM and NCF. Should the gross revenues be less than $250,000, then the fee would be $15,000.

BCM was granted the option, under the clauses of the management agreement, to acquire Brooksville's rights in the CATV system, including the franchises but not the equipment, subsequent to January 1, 1983, and prior to January 1, 1985, for its fair market value but not less than $1,786,000. The purchase price would be paid in part by cancellation of the balance due on the notes to BFM and NCF. The purchase price would be paid as follows: 29 percent in cash and the remaining 71 percent with a nonrecourse note. Upon exercise of the purchase option, BCM would be entitled to lease the equipment for two separate, consecutive 5-year periods. BCM was obligated, pursuant to the terms of the management agreement, to submit annual reports reflecting the system's receipts, revenues, and expenditures to Brooksville. BCM was required to maintain, at its own cost, a place of business with adequate facilities and staff to properly service the subscribers and manage the system. The extent, if any, to which BCM carried out its obligations under the management agreement are unclear in this record. Brooksville, however, claimed ordinary business deductions in its information

returns for 1976, 1977, and 1978 in the respective amounts of $21,800, $14,300, and $3,000.

Brooksville agreed to pay BCM $85,000 upon execution of the management agreement, and $125,000 on January 2, 1977, as an advertising allowance for the promotion and development of the system. BCM agreed to deliver to Brooksville, upon 30 days notice, but no earlier than 12 months from the date of the management agreement, a certificate of performance showing that the said advertising work had been performed.[6] Brooksville acknowledged that BCM would be entitled to a substantial profit on the performance of the said services.

Brooksville and BCM amended the management agreement by letter dated December 7, 1976. Pursuant to the amendment, Brooksville agreed to transmit an additional $62,600 as prepayment of costs to be incurred by BCM over and above what was required by its managerial responsibilities. The letter amendment recognized that a substantial profit might be earned in connection with the performance of the unspecified additional services.

It was very unusual within the CATV industry for the buyer of a system to retain the seller, or a related company, to manage the system during the years in issue. The typical management fee in 1976 was 3 to 5 percent of operating revenues. A management agreement that required the manager to pay for operating expenses and debt service in excess of operating revenues was highly unusual. It was also unusual, during the years in issue, for the manager of a CATV system to be given an option to acquire it.

In addition to the Brooksville CATV system, BCM operated several other systems in Hernando County, Florida, including systems purportedly owned by Hernando Cable TV and Spring Hill Associates.

Pursuant to the terms of the subscriber agreement, Brooksville acquired the rights to service the subscribers to the CATV system serving Brooksville and portions of Hernando County, Florida, for a stated price of $75,000, paid as follows: $40,000 cash and $35,000 by a nonrecourse note. The subscriber rights were subject to a security interest in favor of Jerrold. Cofman executed a nonrecourse

---

[6]The record herein does not contain any certificates of performance.

note in the principal amount of $35,000, pursuant to the terms of the subscriber agreement. The note provided for payment of interest at an annual rate of 6 percent, payable on January 2 of each year. No principal payments were required until January 2, 1988. The nonrecourse note as secured by all of Brooksville CATV system's assets. No payments of principal or interest were made on the $35,000 nonrecourse note by Brooksville. The subscriber list did not have an ascertainable useful life. The value of the subscriber list did not exceed $22,170 as of December 7, 1976.

Under the provisions of the warranty agreement, BFM agreed to keep the equipment in working order and suitable for its intended use in accordance with the standards of the CATV industry and to provide for extraordinary repair beyond ordinary maintenance. BFM further agreed to insure the equipment against any inherent defects, casualty losses, and extraordinary obsolescence, and to replace such equipment within a reasonable period in the event of the occurrence of such defect, loss, or obsolescence. The term of the warranty was from December 7, 1976, until December 31, 1978. In consideration of the warranty, Brooksville agreed to pay to BFM the sum of $220,000 as follows: $20,000 was payable upon execution of the warranty agreement, $100,000 on January 1, 1977, and $100,000 on January 1, 1978. Those amounts were claimed as deductions in Brooksville's returns in the respective years.

A warranty agreement of the type entered into by Brooksville and BFM was unusual in the CATV industry during the years in issue. The warranty had minimum value since the system was relatively new and therefore unlikely to become obsolete in the 2-year period covered by the warranty. The value of the warranty did not exceed $25,000, as of December 7, 1976.

BFM and Brooksville executed a noncompetition agreement pursuant to the terms of which BFM agreed not to compete with Brooksville, directly or indirectly, and not to operate any CATV systems in the same area in which the Brooksville system was located, until December 31, 1979. In consideration of the agreement not to compete, Brooksville was required to pay the sum of $135,000 to BFM, as follows:

$45,000 on December 7, 1976, $45,000 on January 2, 1977, and $45,000 on January 2, 1978.

The noncompetition agreement was unusual in that an affiliate of the party agreeing not to compete was retained to manage the system. The value of the noncompetition agreement did not exceed $10,000, as of December 7, 1976.

The agreements entered into by Brooksville, BFM, BCM, and/or NCF, were customized versions of form agreements that had been prepared by BFM and its counsel during the course of prior negotiations regarding other systems and other partnerships.

At the closing of the transaction between BFM and Brooksville, Frank J. Pitassi, BFM's president, provided Cofman with a copy of the consolidated internal unaudited financial statements of BFM and its affiliates.

On December 7, 1976, Brooksville and Jerrold executed a document pursuant to which Brooksville granted Jerrold a security interest in all of the CATV assets, including the franchises and the subscriber list. The said document stated, inter alia, that (1) on July 10, 1974, Jerrold and Hernando Cable TV had entered into a construction agreement, pursuant to the terms of which Jerrold agreed to construct, and constructed, a CATV system, (2) as security for the payment of the purchase price of the CATV system, Hernando Cable TV gave Jerrold a security interest in the said system, (3) BFM had agreed to acquire said assets from Hernando Cable TV subject to Jerrold's security interest, and (4) Brooksville had agreed to give Jerrold a security interest in all the assets.

A checking account, in the name of Brooksville Properties c/o Morris Cofman was opened at Citizens Bank, Providence, Rhode Island, on December 1, 1976. Deposits, in the total amount of $311,550 and $68,951 were made to the said account in 1976 and 1977, respectively. No deposits were made from June 1, 1978, to December 31, 1980. On December 7, 1976, Cofman signed and delivered to BFM checks totaling $196,749.92. The checks did not indicate the purpose for which they were paid, i.e., the agreements to which specific payments were allocable.[7] By checks dated

---

[7]There are other documents in the record which purport to allocate this total payment to various items, but the documents are in conflict with each other.

December 7, 1976, December 16, 1976, December 21, 1976, and December 27, 1976, Cofman paid $15,241.60 to Feiner Chernis Curtis & Goldman, as a legal fee, and $5,000 to Richard Johnson, $1,225 to Stanley Sichel, and $17,150 to Sam Rosegarten & Assoc. Inc., all as "commissions." There is no evidence in this record that Brooksville paid any other amounts in cash in 1976.

Petitioner Vincent was made aware of the possibility of becoming a limited partner in Brooksville by his attorney and accountant, Dominic Ciarimboli, and by Richard D. Siegal, a New York attorney. Vincent acquired a 2.45-percent limited partnership interest in Brooksville in 1976. Vincent's required contribution to the partnership was $12,250, payable as follows: (1) $2,500 at the time of entry into the partnership, (2) $5,000 by note dated December 6, 1976, due May 15, 1977, payable to the order of BFM, and (3) $4,750 by note dated December 6, 1976, due May 15, 1978. Petitioner paid the two notes with a check to the order of Brooksville on May 15, 1977, and a check to the order of City Trust Bank, dated May 22, 1978, respectively.

In the spring of 1977, BCM was incorporated and Brooksville's purchase money note was assigned by BFM to BCM.

Cofman, as general partner of Brooksville, paid the following amounts in 1977:

| | |
|---|---|
| General partner's fees...................... | $38,000.00 |
| General partner's commissions .............. | 10,000.00 |
| Accounting fees ........................... | 2,750.00 |
| General partner (exchange)................. | 34,250.25 |
| Legal advice (tax opinion).................. | 10,500.00 |
| Office expenses............................ | 888.85 |
| Commissions .............................. | 33,795.00 |
| Consulting fees (Alron)..................... | 10,000.00 |

There is no evidence that Brooksville paid any other amounts in 1977.

BCM and BFM experienced financial difficulties in the later part of 1977. BFM became bankrupt in 1978 and ceased operations.

By letter dated June 6, 1978, Isaacson, BCM's president, informed Cofman that: (1) On April 10, 1978, Phoenix Cable Co., Inc. (Phoenix), a Delaware corporation owned equally by Isaacson and the Galanis Brothers Trust, had acquired

all of the issued and outstanding stock of BFM; (2) Phoenix thereafter caused BFM to change its name to Norwalk Cable Television Construction Co., Inc. (NCTCCI); (3) Isaacson was president of NCTCCI and of BCM, and John Peter Galanis was Chairman of the Board of Directors of NCTCCI and of BCM; and (4) NCTCCI's operations had been funded with $1,500,000.

Phoenix assumed the management of the Brooksville CATV system and other systems in 1978.

Cofman, as general partner of Brooksville, signed checks payable to John Volatile and to himself in the respective amounts of $625 and $3,000, respectively, in 1978, for "office expenses" and "management fee," respectively. There is no evidence that Brooksville paid any other amounts in 1978.

On September 27, 1979, NIRREP Inc. (NIRREP), a New York corporation, Phoenix, NCF, Dominion Investment Co., Ltd.,a St. Vincent, West Indies, corporation, and Cable Communications, Inc., a Delaware corporation, as sellers, entered into an agreement with National Telecommunications, Inc. (NTI), a wholly owned subsidiary of Acton Corp. (Acton), as purchaser, whereby NIRREP and Phoenix, the holders of certain promissory notes issued by certain limited partnerships, sold and transferred all of the notes due from the limited partnerships, including those due from Brooksville, to NTI. Phoenix and NIRREP also assigned all of their rights, duties, and privileges under certain construction agreements to NTI. The consideration due from NTI was $3.6 million, of which amount $85,500 was allocated to Brooksville. Pursuant to the terms of the agreement, NIRREP arranged for each of the limited partnerships, including Brooksville, to enter into separate joint venture agreements with NTI. According to the agreement, the Brooksville CATV system was insured for physical damage based on a value of $225,000 as of September 13, 1979. It was represented, in statements attached to the agreement, that the Brooksville CATV system had 37 existing plant miles and 3,200 homes passed.

Pursuant to the terms of the joint venture agreement, dated September 27, 1979, NTI and Brooksville were to form

a joint venture (the joint venture) to exploit the franchise and operate the CATV system serving the franchised area. Brooksville contributed the franchise to the joint venture and granted it the exclusive right to operate the CATV system for a term of 15 years. NTI was to finance the joint venture "with the objective of expanding the CATV System and fully exploiting its potential," and "to manage the joint venture." The joint venture agreement provided that NTI was required to offer to purchase Brooksville's assets and interest in the joint venture after 7 years of Brooksville's formation for a purchase price equal to the fair market value of the CATV system. NTI was to be given a credit against the purchase price in an amount equal to the accrued unpaid principal and interest on Brooksville's notes, but not to exceed $1,355,000. The joint venture agreement was executed and signed by George M. Phillips (Phillips), as vice president of NTI, and by Cofman, as general partner of Brooksville. It was Isaacson who proposed that Brooksville enter into the joint venture with Acton.

Acton took over the management of the Brooksville CATV system on September 27, 1979.

An account was set up by BFM in Brooksville's name at the First Capital Bank Ltd. (the First Capital account), in St. Vincent, West Indies. Cofman had no control over this account. Bank statements dated December 30, 1978, reflect that funds in the amount of $90,265, were transferred by NCF to the aforesaid account. The funds were transferred to NCTCCI, following instructions received by the bank. A bank statement, dated January 31, 1980, showed the following transactions:

| As of— | Item | Amount |
|---|---|---|
| 1/25/79 | Deposits or credits | $485,100 |
| | Deposits or credits | 40,765 |
| | Checks or debits | 495,000 |
| | Checks or debits | 30,865 |

On or about February 7, 1980, NTI changed its name to Acton CATV, Inc.[8]

A satellite earth station was not installed until February 1980.

---

[8]For convenience, we continue to refer to Acton CATV, Inc., as Acton.

In response to Phillips' request in connection with an examination of Acton's financial statements, dated February 25, 1980, Cofman confirmed to Arthur Young & Co., certified public accountants, that the following amounts were due from Brooksville to Acton, as successor to BFM:

| Note | Date of note | Original principal |
|------|---------|-----------|
| Subscriber promissory note | 12/7/76 | $35,000 |
| Promissory note | 12/7/76 | 825,000 |

Cofman also confirmed that, as of March 3, 1980, no interest or principal payments had been made on the notes since the date of inception.

On March 4, 1980, the Board of County Commissioners of Hernando County, Florida, adopted Ordinance No. 80-1 providing rules and regulations concerning the application, grant, operation, and termination of CATV franchises in Hernando County. On March 31, 1981, the original CATV franchise for Hernando County was canceled and replaced by a nonexclusive 15-year franchise granted to Acton by the Board of County Commissioners of Hernando County, Florida.

In response to Robert C. Fink's (Acton's vice president and chief financial officer) letter, dated December 31, 1980, Cofman confirmed to Pannell Kerr Forester, certified public accountants, that no payments of interest or principal had been made on the nonrecourse note in the amount of $825,000 as of December 31, 1980.

By letter dated February 6, 1981, Phillips informed Cofman that Acton had obtained American Security Bank, N.A.'s commitment to loan Acton certain moneys for the development and construction of certain CATV systems.

On February 10, 1981, Cofman confirmed in writing, at Acton's request, Acton's statement that:

We [Acton] have an obligation to purchase and you [Brooksville] have an obligation to sell (a) all of the assets of the partnership relating to the subject CATV System (collectively the "partnership Assets"); and (b) your entire joint venture interest, notwithstanding any provisions to the contrary set forth in the Venture Agreement * * *

Pay television first became available to the subscribers of the Brooksville CATV system on March 11, 1980.

In April 1982, American Security Bank agreed to increase the principal amount of the loan to Acton from $23 million to $36 million.

By letter dated December 7, 1983, Acton informed Brooksville that: (1) It was exercising its right to buy; (2) pursuant to the agreement, Acton was to be given a credit in an amount equal to the principal and interest on certain notes, not to exceed $1,355,000; (3) in Acton's opinion, the said amount exceeded the fair market value of Brooksville's interest; and (4) as consideration for the purchase, Acton was relieving Brooksville of any further obligations on the aforesaid notes.

By letter dated December 22, 1983, Cofman rejected Acton's exercise of its "alleged" contractual rights under the joint venture agreement, and in February 1984, instituted a suit against Acton and NTI in the U.S. District Court for the District of Massachusetts alleging, inter alia, that they had failed to discharge their duties under the joint venture agreement, and to use or allocate the proceeds of the loan from American Security Bank for the operation and expansion of the Brooksville CATV system.

On October 26, 1984, a purchase agreement was entered into by Centel Cable Television Co. of Florida (Centel), a Florida corporation, as purchaser, and Hernando Associates Venture, Spring Hill Associates, the joint venture, and Acton, as sellers, whereby the sellers sold all the tangible and intangible assets held by them to Centel for a price of $2,900,000. The agreement was signed by Phillips, as attorney in fact for the joint venture. Brooksville did not receive any sales proceeds from the sale of the CATV system to Centel.

The mileage, number of subscribers and homes passed, and subscriber rates for the Brooksville CATV system were as follows, as of the indicated dates:

| As of— | Mileage | Number of subscribers | Number of homes passed | Subscriber rates (per month) |
|--------|---------|-----------------------|------------------------|------------------------------|
| 11/16/77 | | 739 | | |
| 12/31/79 | 37 | | 1,871 | |
| 2/29/80 | 37.4 | 1,045 basic 311 secondary | 1,871 | |
| 5/30/80 | 37.4 | | 1,871 | $5.00 primary |

| As of— | Mileage | Number of subscribers | Number of homes passed | Subscriber rates (per month) |
|---|---|---|---|---|
| | | | | $1.50 secondary |
| | | | | 9.95 pay |
| 8/22/80 | | 1,185 basic[9] | | |
| | | 332 secondary | | |
| | | 328 pay | | |
| 12/31/80 | 39 | | 2,206 | |
| 12/31/81 | 43 | | 2,843 | |
| 10/26/84 | 47.98 | | | 8.00 basic |
| | | | | 11.00 HBO |
| | | | | 11.00 Showtime |
| | | | | 3.25 additional outlet |

Brooksville filed Forms 1065, U.S. Partnership Returns of Income, with the Internal Revenue Service for its taxable years 1976 through 1983. Brooksville used the cash receipts and disbursements method of accounting. The table on page 719 summarizes the items reported on said returns.

Brooksville claimed an investment in used property with a useful life of 7 or more years, qualifying for the investment tax credit, in the amount of $100,000 in 1976.

Petitioners reported items of loss and credit from Brooksville as follows:

| Year | Losses from Brooksville | Investment tax credit from Brooksville[10] |
|---|---|---|
| 1976 | $8,301 | $245 |
| 1977 | 14,740 | |
| 1978 | 8,361 | |

In his notices of deficiency dated April 9, 1982, and May 11, 1982, respondent disallowed all of the aforesaid losses and credit on the grounds that petitioners had failed to establish: (1) That the alleged events, transactions, and expenditures ever occurred in fact or in substance, (2) that the venture was entered into for profit, or was in a trade or business, or was otherwise held for the production of income, (3) that the underlying events or transactions were entered into for profit, or arose in a trade or business, (4)

---

[9]Cofman represented, in his report to the limited partners dated July 7, 1980, that the system had 1221 primary subscribers, 339 secondary subscribers, and 275 pay subscribers as of May 30, 1980.

[10]Petitioners claimed a qualified investment in used property with a useful life of 7 or more years, qualifying for the investment tax credit, in the amount of $2,450, as their distributive share of investment tax credit from Brooksville.

Taxable Year

| Items | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|---|---|
| Gross receipts | 0 | $46,514 | $53,387 | | | | | |
| Depreciation[1] | $30,714 | 177,704 | 139,625 | 109,705 | 104,935 | 104,935 | 104,935 | 87,447 |
| Interest | 4,300 | 62,000 | 7,000 | | | | | |
| Management fee | 21,800 | 14,300 | 3,000 | | | | | |
| Subscriber connections | 26,000 | | | | | | | |
| Promotion and advertising fees | 85,000 | 125,000 | | | | | | |
| Promotional fees | | 13,250 | | | | | | |
| Consulting fees | 5,000 | 10,000 | | | 1,050 | | | |
| Administrative expense | 25,000 | | | | | | | |
| Non-competition fee | 45,000 | 45,000 | 45,000 | | | | | |
| Contract labor | 10,200 | 23,948 | 23,268 | | | | | |
| Rent | | 8,175 | 5,006 | | | | | |
| Property taxes | 7,247 | 5,235 | 10,746 | | | | | |
| Vehicle expense | 593 | 3,799 | 5,043 | | | | | |
| Utilities | 6,500 | 5,262 | 4,232 | | | | | |
| Insurance | 1,805 | 2,747 | 0 | | | | | |
| Office expense | 0 | 9,421 | 9,542 | | | | | |
| Telephone | 5,720 | 5,222 | 4,346 | | | | | |
| Travel and entertainment | | 953 | | | | | | |
| Organizational expenses | 20,000 | 4,649 | 4,649 | 4,649 | 4,648 | 4,647 | | |
| Warranty | 40,000 | 100,000 | 100,000 | | | | | |
| Subscriber list | | 17,500 | 17,500 | | | | | |
| Pole rental | 2,717 | 5,935 | 8,168 | | | | | |
| Franchise fees | | 1,967 | 2,445 | | | | | |
| Maintenance and supplies | 1,213 | 3,874 | 1,847 | | | | | |
| Computer service | | | 3,231 | | | | | |
| Data processing | | 2,194 | | | | | | |
| Loss | [2](388,814) | (601,621) | (341,261) | (114,354) | [2](110,641) | (109,582) | (104,935) | (87,447) |

[1] Brooksville claimed a depreciable basis in the equipment of $860,000 and used the 150-percent declining balance method of computing depreciation over a 7-year useful life until 1980, when it switched to the straight line depreciation method.

[2] The parties stipulated as to the items and amounts of income and deduction, and total losses. The total losses shown, *supra*, for 1976 and 1980 are the actual losses claimed on Brooksville's returns; the mathematical additions, however, are incorrect due to the following: (1) The correct amount deducted as utilities in 1976 is $596, and not $593 as stipulated by the parties, (2) bank charges, in the amount of $8, were also deducted by Brooksville in 1980.

the adjusted basis of assets allegedly subject to depreciation and amortization, the useful lives of such assets, and the method of depreciation and amortization, (5) that the claimed losses were not in excess of their adjusted basis, (6) that any nonrecourse financing should be considered in determining their adjusted basis in the partnership or in determining the adjusted basis of the partnership's assets, (7) with respect to the deductions claimed, that all events had occurred which determined the fact of liability and the amount thereof with reasonable accuracy, (8) with respect to the deductions claimed, that the amounts claimed were paid, that they were incurred in a trade or business or for the production of income, and that they were not either capital or preoperating expenditures, and (9) that petitioners were entitled to a distributive share of a claimed investment tax credit.

## OPINION

The ultimate issues to be decided herein are the extent, if any, to which petitioners are entitled to deduct their distributive share of losses of Brooksville claimed for their taxable years 1976, 1977, and 1978, and whether they may claim their distributive share of an investment tax credit for their taxable year 1976.[11] The determination of these issues depends upon whether Brooksville is entitled to claimed deductions for depreciation and/or amortization, interest expense, noncompetition fees, promotion and advertising expenses, management fees, consulting fees, warranty fees, administrative expenses, legal and professional fees, organizational fees, and other fees and expenses, and whether Brooksville is entitled to a claimed investment tax credit with respect to the equipment.

---

[11]Respondent did not assert the applicability of sec. 6621(d), as added by sec. 144 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 682, in his notices of deficiency, nor in his answers to the petition filed on Aug. 18, 1982, and on Aug. 25, 1982, nor by amendment to the pleadings. On brief, however, respondent's counsel "urges the Court to find that the Brooksville transaction at issue here was tax motivated for purposes of sec. 6621(d)." Respondent has raised numerous alternative grounds for the disallowance of the claimed losses and credits, not all of which are "tax motivated transactions" as defined in sec. 6621(d)(3)(A).

The same considerations that formed the basis of our denial of the Commissioner's motion for leave to amend his answer so as to assert the applicability of the said section in *Law v. Commissioner*, 84 T.C. 985 (1985); *Forseth v. Commissioner*, T.C. Memo. 1985-279, on appeal (5th Cir., Feb. 4, 1986; 6th Cir., Feb. 4, 1986; 7th Cir., Feb. 4, 1986; 9th Cir., Feb. 3, 1986; 11th Cir., Feb. 5, 1986); and *Jameson v. Commissioner*, T.C. Memo. 1985-262, require us to decline to decide this issue.

Respondent advances a wide array of arguments in support of disallowance of the claimed losses and credit. One of respondent's principal arguments is that the said losses and credit arose out of an activity not engaged in for profit within the meaning of section 183.[12]

## Issue 1: Claimed Deductions and Losses

Section 183(a) provides that deductions arising from an activity "not engaged in for profit," as defined in section 183(c), shall not be allowed, except as provided in section 183(b).[13] If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit but only to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1).

Whether a partnership is engaged in a trade or business or in an activity for which deductions are allowable under section 212 is determined at the partnership level. *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd.

---

[12]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

[13]Sec. 183 provided, in pertinent part, as follows during the years in issue:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(A) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(B) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(C) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

without published opinions sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-9 (3d Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659 (1982); *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). To fall outside section 183, the partnership must prove that it engaged in the activities in issue with an actual and honest profit objective. Rule 142(a); *Dreicer v. Commissioner*, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The inquiry turns on whether the primary purpose and intention of the partnership in engaging in the activity was to make a profit. *Fox v. Commissioner, supra*; *Hager v. Commissioner*, 76 T.C. 759 (1981), and cases cited therein. As used in this context, "primary" means "of first importance" or "principally," *Surloff v. Commissioner*, 81 T.C. 210 (1983); *Jefferson v. Commissioner*, 50 T.C. 963 (1968), citing *Malat v. Riddle*, 383 U.S. 569, 572 (1966), and "profit" means economic profit, independent of tax savings. *Surloff v. Commissioner, supra*; *Shapiro v. Commissioner*, 40 T.C. 34 (1963). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. *Bessenyey v. Commissioner*, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). The issue is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; *Fox v. Commissioner, supra*; *Golanty v. Commissioner*, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Partnerships present a special problem in applying section 183. "Partnerships are mere formal entities. Obviously, they do not have independent minds of their own." *Fox v. Commissioner*, 80 T.C. at 1007. In determining partnership intent, we have often focused on the actions taken by the general partner. See, e.g., *Siegel v. Commissioner, supra*; *Brannen v. Commissioner, supra*; *Hager v. Commissioner, supra*.

In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and

effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. A record of losses over the years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Sec. 1.183-2(b)(6), Income Tax Regs. It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183-2(b), Income Tax Regs.

Cofman did not have any experience or knowledge about the CATV industry in 1976 other than his having read some Department of Commerce periodicals and newspaper articles. The memorandum specifically listed, as one of the risk factors to be considered by potential purchasers of limited partnership interests, Cofman's lack of experience in any of the aspects of the CATV industry, viz, evaluating, acquiring, owning, or leasing CATV systems, and stated that he was dependent upon the advice of *independent* consultants to evaluate the economic viability of the system and BCM's performance as manager. The "independent consultant" retained by Cofman was Alron, a firm consisting of one person, Jack Scheinman, recommended by Isaacson—who was associated with BFM, seeking potential purchasers for its CATV systems, and who was BCM's president—to prepare an appraisal report of the system. Alron did not have any clients other than partnerships engaged in transactions similar to the one entered by Brooksville with BFM. The memorandum forewarned potential investors that "no assurance can be given that it [Brooksville] will be successful in obtaining consultation that will adequately service the partnerships's needs." The four-page appraisal report is at best inadequate. The report stated that the CATV system was in operation in the franchised area on one page, and on another stated that the system "should probably be well begun and a substantial portion able to be operational,

certainly within the next several months." No specific data or basis were provided for the generalized conclusions reached. It was assumed that the franchised area supported "a 4,000 home statistic," but no references were made to a census or any other source in support of this assumption. The report did not contain any projections of revenues, income, expenses, profits, or number of subscribers. The report similarly did not contain a breakdown of the cost of the CATV system components or a reproduction cost analysis, nor an analysis of BCM's management capabilities. No other independent consultants were hired by Cofman.

None of the officers and directors of BFM and BCM had previous experience in the CATV industry, according to the confidential memorandum. The only person who was represented as having some knowledge of the industry, Rufus Ross, was active in the management of other systems and was committed to manage other systems located in Hernando County.

The tax opinion prepared by Cannon, who also prepared tax opinions for several other partnerships which acquired CATV systems from BFM and retained BCM as their manager, is, on the other hand, a 38-page document containing a detailed analysis of the Federal income tax consequences to the partnership and the general and limited partners of the transactions described in the confidential memorandum, the proposed limited partnership agreement, and the forms of the contracts and agreements to be entered into by BFM, BCM, NCF, and Brooksville. The confidential memorandum also contained substantial discussion of the Federal income tax consequences of the transaction.

Cofman testified that he had made inquiries regarding the qualifications of BCM as manager of CATV systems and BFM's financial condition. Neither assertion is supported by this record. The agreements entered into by Cofman, as general partner of Brooksville, were clearly a package deal. It was stated in the confidential memorandum that the partnership was to enter into all of its agreements with BFM or its affiliates, of which BCM was one. Other than his obtaining internal unaudited financial statements of BFM and its affiliates, Cofman did not make any inquiries regarding the financial condition of BFM and its affiliates.

We note that the transmittal letter accompanying the internal unaudited financial statements was dated December 7, 1976. At best, Cofman received the said financial statements at the closing of the transaction herein; this hardly qualifies as a thorough check of a company's finances. Furthermore, Cofman was aware that although BCM was obligated to cover any deficits resulting from operating the system, it had been capitalized with only $50,000. Admittedly, it was represented in the memorandum that BFM, as general partner, was also liable for this commitment. It was also represented, however, that BFM was similarly obligated with respect to a number of other systems and that BFM was giving no assurance that it would be in a position to honor this commitment. Cofman was not concerned that BCM or BFM might not have sufficient assets to meet their obligations.

The confidential memorandum of understanding apprised potential limited partners that the partnership would "be managed solely by the General Partner who will devote only so much of his time to the partnership's business as, in his judgment, is reasonably required," and indicated that Cofman would have conflicts of interest in allocating his time between the partnership and other partnerships or business ventures (see our findings of fact, *supra*). Cofman was also the general partner of two other partnerships that had acquired assets from BFM and entered into transactions similar to the transaction herein, Mildale Associates and Rialto Properties. Mildale Associates and Rialto suffered substantial losses.

We are satisfied that during the years in issue, Cofman devoted a minimum amount of time to his duties as general partner of Brooksville. Cofman testified that he had discussed his ideas as to how to build up the business to its fullest potential and that he reviewed BCM's performance as a manager. His testimony is, however, unsupported by this record. No memoranda, correspondence, or any other documents were produced to verify Cofman's discussions or instructions to BFM. No witnesses from BFM or BCM testified at trial. Under the terms of the management agreement, only quarterly reports were due from BCM. Although the reports were not forthcoming even under that

limited schedule, Cofman did not take any measures in this regard. Cofman's testimony that he made weekly telephone calls to BCM and visited their office in Connecticut is not supported by the record. At no time were Cofman's alleged concerns reduced to writing. The record contains only two letters from BCM to Cofman, dated May 7, 1977, and June 6, 1978, and no letters from Cofman to BCM. The record contains only two reports from Cofman to the limited partners, dated November 16, 1977, and July 7, 1980. Petitioners' statement that Cofman was dissatisfied with BCM's performance and replaced it with Phoenix, as manager of the CATV system, lacks any evidentiary support. Rather, Cofman was informed by Isaacson that Phoenix had acquired all of BFM's issued and outstanding stock. Phoenix then became the manager of the system. Similarly, Acton assumed the management of the system as a result of the transfer of the promissory notes held by NIRREP and Phoenix to NTI, Acton's subsidiary, and not at Cofman's initiative.

The record is also clear that there was no arm's-length price negotiation between BFM and Cofman, as general partner of Brooksville. Cofman, as general partner, obligated the partnership to pay $860,000 for the CATV system's equipment, payable $35,000 in cash and $825,000 by a nonrecourse note. The confidential memorandum stated that Brooksville was purchasing all of its assets from, and entering into all of its agreements with BFM or its affiliates and that "as a result, BFM Constructors, Inc. will make a substantial profit." It was also stated that BFM had acquired the CATV system, including the franchises and the subscriber list, from an independent third party at prices *significantly below* those to be paid by Brooksville.

In arriving at a value for the Brooksville CATV system, Edward T. Rutter, respondent's expert witness, considered several factors and methodologies including comparable sales, income stream, and historical cost.

Rutter estimated a total cost value of $435,000 for the tangible assets comprising the CATV system as of December 7, 1976 (the date on which the agreements were executed), as follows: (a) $70,000 for the antenna and the headend and site equipment; (b) $320,000 for the distribution system—

amplifier and trunk lines, smaller distribution cables and distribution amplifiers, and drop wires comprising 40 miles[14] of overhead distribution plant X $8,000 per mile—; and (c) $45,000 for the drops in place (850 subscribers X $55 per subscriber). Rutter's pricing of the distribution system took into account the cost of tree trimming, system design, and setup and organization expenses. Depreciation was not taken into account because, at the time that the partnership entered into the transaction herein, the CATV system was fairly new (it had been in existence for approximately 15 months).

In applying the comparable sales approach, Rutter ascertained that in December 1976, CATV systems, including franchises and other intangibles, were selling for prices amounting to between $350 and $450 per subscriber. These comparable sales would establish a value for the Brooksville CATV system in the $297,500 to $382,500 range if the 850-subscriber figure represented in the confidential memorandum is taken into account. A subscriber count of 739[15] would result in a value ranging from $258,650 to $332,550.

Rutter determined that under the expected cash flow or income stream approach, the value of the system would be $285,000. Rutter's determination was based on his conclusion that the maximum number of subscribers to the system, when fully developed, would be 1,200. He noted that (1) the confidential memorandum represented that 4,000[16] homes were passed by the system, and that the system had only 850 subscribers (a 21-percent saturation rate), (2) the system had been in existence for over a year as of the time the transaction herein was entered into, (3) the first year is typically when aggressive marketing is done, and (4) the system was not offering any channels that were not available to a nonsubscriber, in reaching the 1,200-subscriber figure. Rutter applied the rates indicated in the

[14]According to the confidential memorandum, the distribution system consisted of 40 miles of aerial plant. The equipment agreement represented that the distribution system consisted of 43 miles of plant. It was represented, in statements attached to the agreement pursuant to which NIRREP arranged for Brooksville to enter into the joint venture agreement with NTI, and we have found, that the distribution system consisted of 37 miles as of Sept. 27, 1979.

[15]Cofman represented to petitioner, in a letter dated Nov. 16, 1977, that, as of that date, the system had 739 subscribers.

[16]Other documents in evidence state, however, that the number of houses passed as of Dec. 31, 1979, was 1,871.

confidential memorandum in applying the expected cash flow or income stream approach. The confidential memorandum stated that unless the system could obtain a saturation of 42 percent, on the basis of a monthly subscriber rate of $7.50, or of 72 percent, based on present monthly subscriber rates, the operation of the system would not generate sufficient revenue to cover expenses and debt service.

Petitioners submitted the testimony and appraisal report of their expert witness, Charles E. Walters, in support of their contention that the purchase price of the Brooksville CATV system was equivalent to its fair market value as of the date of the transaction herein. Walters' full-time employment did not involve the valuation, buying, building, or selling of CATV systems or assets, nor the startup or supervision of CATV operations. Walters conducted independent appraisal activities for clients in the broadcast and subscription television industry, on a part-time basis, under the name "Telecommunications Valuation Services," a firm that he started in December 1983. Neither Telecommunications Valuation Services nor Walters was listed in any directories of cable television systems appraisers or consultants.

Walters determined the following values for the assets comprising the Brooksville CATV system:

| | |
|---|---:|
| Distribution system | $650,021 |
| Headend and antennas | 89,179 |
| Other tangible assets | 55,413 |
| Total tangible assets | 794,613 |
| Favorable financing agreements | 96,604 |
| Subscriber base asset | 16,703 |
| Going concern value | 11,800 |
| Franchise operating rights | 40,280 |
| Total intangible assets | 165,387 |
| Total value of Brooksville CATV system | 960,000 |

Walters' appraisal was based on a 2-day physical inspection of the Brooksville CATV system 10 days prior to the trial herein, on December 1 and 2, 1984. Walters' appraisal was of the assets comprising the Brooksville CATV system on December 1984, valued as of October 1976. Walters stated in his report that he had applied the replacement

cost less observed depreciation approach in valuing the assets. At trial, he described the approach applied by him as follows:

Well, the method that I used in establishing a value of a cable television station, cable television system is to identify as reasonably as I can all the assets associated with that cable television system, assign a value to the tangible assets and intangible assets, and make a gap allocation between the difference of the price paid and the value of the identifiable assets.

Walters assumed that there were a total of 850 subscriber drops as of October 1976. Walters' report stated that "The appraiser consulted with technicians familiar with the system and made a visual inspection of the RF distribution plant in use at the system. The appraiser also relied on documents supplied by the purchaser of the system in determining the equipment complements installed in the system."[17]

Walters attributed a value of $55,413 to "other tangible assets." These assets purportedly included furniture and fixtures, office machines, vehicles, test equipment, tools, spare parts, and other miscellaneous assets typically used in operating a CATV system. According to Walters' report,

These assets were unavailable for inspection by the appraiser during his visit of December 1 and 2, 1984. Therefore, the appraiser relied on his experience and knowledge of the cable television industry in order to arrive at a reasonable estimate of the value of these assets at the Brooksville cable system as of October, 1976.

Walters stated that had he arrived at the $55,413 figure by reviewing a total of 42-system appraisals in which he had participated during the period between 1977 and 1982. According to Walters, a total of 11 CATV systems similar to Brooksville's (with 2,000 or less subscribers) were identified, and asset categories for each of the systems were averaged to determine an estimated appraised value for each category. We think that Walters' valuation of the purported "other tangible assets" on the basis of his "experience and

---

[17]It is unclear whether Walters was supplied with documents showing that the representations made in the confidential memorandum—as to, inter alia, number of houses passed, number of subscribers—were inaccurate. Walters testified that he was provided with a copy of the equipment agreement including a list of the equipment that had been transferred to the partnership, an estimate of the system's mileage, and the warranty agreement.

knowledge" and other systems' appraisals is at best questionable. For all we know, it could be that the said assets did not even exist.

Walters determined that "a valuable intangible asset" acquired by the partnership consisted of favorable financing agreements, set out in two promissory notes in the respective amounts of $825,000 and $35,000, at a rate of interest lower than the average national rate. Walters attributed a value of $96,604 to this asset.

Walters determined a value of $16,703 for the "subscriber base asset," or the cost of acquiring subscribers. Walters based his determination on an 850-subscriber base. He further determined a "going concern value" of $11,800. According to the report, "The value of the going concern can be determined by analyzing the costs required to reproduce the organization and procedures in place at the system."

According to his report, Walters determined the value of the "franchise operating rights" by the residual or "gap" method, viz, (1) he determined that the total value of the intangible assets was $165,387, (2) he then subtracted the sum of the values previously determined for the subscriber base asset ($16,703), the favorable financing agreement ($96,604), and going concern ($11,800), or $125,107, from $165,387, (3) the difference, $40,280, was the total value assigned to the franchise operating rights.

By valuing the system's components as they existed in 1984 as of October 31, 1976,[18] Walters included equipment that was not in place in 1976, but was added in later years in connection with the upgrading and expanding of the system. We have serious reservations regarding the accuracy and reliability of the methodology employed by Walters and are unpersuaded by his valuation of the assets of the Brooksville CATV system. We are satisfied that the value of the equipment of the Brooksville CATV system did not exceed $406,645 as of December 7, 1976, as we have found.

Cofman, as general partner, entered into several other agreements with BFM and its affiliate BCM, namely, the (1)

---

[18]The agreements pertaining to the transaction herein were executed on Dec. 7, 1976. The confidential memorandum was dated Nov. 5, 1976. The proper valuation date is Dec. 7, 1976.

franchise agreement, (2) management agreement, (3) subscriber agreement, and (4) noncompetition agreement. Some of the provisions contained in the aforesaid agreements were unusual in the CATV industry, and the payments required were excessive (see *infra*).

It is reasonable to conclude that Cofman agreed to pay, as disclosed in the confidential memorandum, prices that were significantly in excess of their fair market value for the assets, both tangible and intangible, comprising the CATV system, and for the rights granted pursuant to the agreements executed contemporaneously with the purchase of the said system. (See *infra*). Petitioners argue, however, that they "purchased the cable television system for the purpose of deriving an economic profit from * * * its eventual appreciation in value." In support of their contentions, petitioners submitted computations purportedly showing a projected value for the system of $2,008,120 in 1984.[19] Petitioners assumed that the value per subscriber in 1976 was $400, based on Scheinman's statement in his report dated November 30, 1976, that "When the projected subscriber and revenue is reached, $400 as a basis for sales prices falls within the lower level of estimates by expert opinion among the more cognizant members of the Industry community." Petitioners further assumed a steady annual growth rate of 15 percent in the number of subscribers based on an article from the January 1976 issue of U.S. Industrial Outlook.[20]

We are unconvinced by petitioners' projection and by their contention that they intended to make a profit on the sale of the system. The statement in Scheinman's report is of questionable value as support for petitioners' assertion that the value per subscriber was $400 in 1976. The said statement is at best unclear. We do not believe that petitioners' assumption of a 15-percent annual growth rate is supported by the articles in evidence. There are only two

---

[19]As follows:

| Value per subscriber in 1984 ($1,220) | | Number of homes | | Value of system in 1984 |
|---|---|---|---|---|
| | x | 1,646 | = | $2,008,120 |

[20]We could not find references to growth rate estimates in any of the other articles cited by petitioners in support of their contention.

pages from the aforementioned article from U.S. Industrial Outlook in this record. It is there stated that "Improvement [in the expansion of the CATV industry] is expected in 1976, with a resumption of a 12 to 15 percent growth rate in prospect for 1977," and that "Revenues for basic subscriber service totalled about $675 million in 1975, up 14 percent from 1974. They are expected to rise about 15 percent to $775 million in 1976."

Even assuming, arguendo, that the aforesaid statements support the assumption of a national growth rate of 15 percent for 1977 and subsequent years, we fail to see how they can be interpreted as a basis for (1) determining a 15-percent annual growth rate in the value per subscriber, (2) determining a percentage annual growth rate for the Brooksville CATV system and (3) determining the annual growth rate for years after 1977. We accordingly reject petitioners' projection.

On October 26, 1984, the assets, including the franchises, of the Brooksville system, Spring Hill Associates, and Hernando Associates were sold by Acton to Centel for $2,900,000. No specific allocation of the sales price was made between the three systems. The record herein does not contain sufficient information to determine what portion of the purchase price was allocable to the Brooksville CATV system, and what portions were allocable to improvements and additions made between 1979 and 1984, and/or to appreciation in value.

Brooksville suffered losses for its taxable years 1976 through 1983 (see our findings of fact, *supra*). Brooksville had no gross receipts during its years 1976, and 1979 through 1982, inclusive. Petitioners argue that it was likely that Brooksville would achieve a profitable operation, and that "the losses which ultimately resulted from the operation of this cable television system were the result of mismanagement and waste and were certainly not inherent in the investment."

The confidential memorandum contained estimated cash flow and other projections, including a profit and loss projection. It was stated that *"The estimated cash flow and other projections contained in this memorandum are based in part upon the availability of Pay TV or Home Box Office*

*for Subscribers to the System;*" and that BCM *intended* to import the signals of Channels 17 and 6 from Atlanta and Miami, respectively, and to offer a form of pay television to subscribers. In order to import the additional signals and obtain pay television, the system required the use of a microwave station. It was anticipated that BCM would build the station and lease it to Brooksville. It was assumed, in making the aforesaid projections, that the pay television fee would approximate $7.50 per month. BCM was not, however, obligated to build the microwave station and to import additional signals, nor to offer pay television to subscribers. The memorandum specifically stated that "there can be no assurance that manager will be able to implement its intent to obtain Pay TV subscribers because of the costs involved, the attractiveness and or diversity of programming or for other reasons, in which event Manager and the Partnership would be adversely affected" and that "no representation is made that Manager [BCM] will build a microwave station." We note that pay television was not available as of November 5, 1976, the date of the confidential memorandum; it was projected, however, that the system would receive $1,200 in operating revenues from pay television subscribers. Pay television was not, in fact, offered until March 11, 1980.

We fail to see how the projections contained in the confidential memorandum could be relied upon when almost every assumption on which they were based—number of actual subscribers, number of houses passed, number of houses serviceable, availability of pay television, import of additional signals, and subscriber rates—was at best questionable. Even under the rosy picture portrayed in the confidential memorandum, Brooksville would have had substantial losses during the first 4 years of operations ($1,254,500) and would have had profits only from 1980 on. Finally, as to the allegations that the losses were due to mismanagement and waste and not to the investment, we have nothing more than Cofman's self-serving testimony in support of this contention. It was Cofman, who entered into a management agreement that assured BCM the payment of excessive fees which were not—until 1979 and thereafter—contingent on the gross revenues of the system. As we

discuss, *infra*, in exchange for the said fees, BCM made many declarations of good intention but entered into no binding agreements. Greater weight is to be given to objective facts than to the parties' mere after-the-fact statements of their intent. *Thomas v. Commissioner*, 84 T.C. 1244 (1985).

We are not second-guessing the business judgment of the partnership. The test under section 183 is not whether the partnership had a reasonable expectation of profit, but only whether it had a bona fide profit objective. See *Dreicer v. Commissioner*, *supra*. Under the facts of this case, we must hold that petitioners have failed to prove that the Brooksville Partnership CATV enterprise was entered with a bona fide profit motive. Deductions with respect to the activities herein are therefore limited as provided in sections 183(b)(1) and 183(b)(2).

We now turn to section 183(b)(1) to determine the amount, if any, of the deductions which are allowable.

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Brooksville used the cash receipts and disbursements method of accounting. Under the said method, amounts representing allowable deductions, with exceptions not pertinent herein, are taken into account for the taxable year in which paid. Sec. 1.461-1(a)(1), Income Tax Regs. Petitioners bear the burden of proving that the claimed interest payments were actually made. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a). Petitioners have not met their burden.

Cofman confirmed in writing, on March 3, 1980, in response to Phillips' request in connection with Arthur Young & Co.'s examination of Acton's financial statements for its year ended December 31, 1979, that no payments of interest and principal had been made on the subscriber promissory note, dated December 7, 1976, in the amount of $35,000, nor on the equipment promissory note, dated December 7, 1976, in the amount of $825,000.[21] On brief, petitioners concede that no interest was paid on the nonrecourse equipment note. Moreover, we have held, *infra*, that the said note was purely illusory.

---

[21]See note 25 *infra*.

Petitioners argue, however, that pursuant to the loan agreement between NCF, an affiliate of BFM, and Brooksville, funds in the amount of $495,000 were to be loaned to Brooksville to enable it to pay certain fees, operating expenses, and interest costs payable to BFM in the early years of operations. Petitioners argue that under the said agreement, the loaned funds were to be transferred "to a special Partnership account and then immediately transferred to BFM's account for use by BFM, on behalf of the Partnership, in liquidation of [the] partnership debt and for use as working capital." These amounts were, the argument follows, applied in part to pay Brooksville's interest obligations. In support of their contentions, petitioners submitted bank statements and account charge forms pertaining to an account that was opened by BFM, in Brooksville's name, at First Capital Bank Ltd., in St. Vincent, West Indies, showing deposits and debits as described in our findings of fact, *supra*, and accountant's work papers purportedly utilized in the preparation of Brooksville's tax returns.

Under the loan agreement, NCF was to loan to Brooksville and *not* to BFM the sum of $495,000.[22] Nowhere in the loan agreement, the security agreement, nor the financing statement is there a reference to any special partnership account or to an obligation on the part of Brooksville to transfer such funds to BFM or any of its affiliates. Moreover, Cofman did not have control over the First Capital account, and had no knowledge of the account's existence until he received the aforesaid bank statements. Cofman further testified as follows:

Q. Do you know whether the amount agreed upon in the loan agreement that was to be advanced to the partnership was ever received by the partnership as agreed?

A. Which loan are you talking about? The one from North County Finance?

Q. That's right. Did you ever receive any money from Noth [sic] County Financial? Was it actually received?

A. That went into the management company and they paid from there.

---

[22]According to the confidential memorandum, none of the proceeds of the loan were to be drawn in 1976; $343,000 and $152,000 were to be drawn in 1977 and 1978, respectively. Of the $343,000 that were to be drawn in 1977, only $8,600 were represented as allocated for the payment of interest.

I did not receive it. It went into the management company. I signed for it.

* * * * * * *

Q. Okay. Do you know that it was transferred to the management company?

A. I don't know; I don't know.

The parties stipulated that "no notes or copies of notes prepared or executed pursuant to the loan agreement can be located." The record contains a form of promissory note by Brooksville to NCF. The date and Cofman's signature are scratched out. Cofman could not explain the reason for this.

The account charge forms, dated December 30, 1978, indicate that (1) the amount of $90,265 was purportedly transferred to the First Capital account by NCF, and (2) funds, in the amount of $90,265 were transferred to NCTCCI, BFM's successor. The latter account charge form has the notation "Payment towards construction note interest $49,500 and Warranty Fee $40,765" written on it. We note that (1) Cofman did not sign any construction notes; (2) Brooksville gave Jerrold a security interest in the CATV system, but did not assume liability for the notes given Jerrold by Hernando Cable TV for the construction of the system. The accountant's work papers are not supported by checks or any other evidence of payment and are not probative that the amounts therein described as interest or prepaid interest were actually paid.

In sum, petitioners have failed to prove that: (1) A bona fide and genuine indebtedness existed on the part of Brooksville, (2) interest on said indebtedness was paid by Brooksville, (3) any amounts were actually loaned and transferred by NCF to Brooksville, (4) any agreements existed that required Brooksville to authorize transfer of any loaned amounts to BFM, and (5) that BFM paid any interest, as Brooksville's agent, on a bona fide, genuine indebtedness of Brooksville. It follows that petitioners are not entitled to claimed interest deductions under sections 163 and 183(b)(1).

Brooksville claimed deductions for property taxes in the respective amounts of $5,235 and $10,746 for its taxable years 1977 and 1978 (see our findings of fact, *supra*).

Section 164(a)(1) allows as a deduction for the taxable

year *within which paid or accrued*, State and local, and foreign real property taxes. Taxes qualify as "deductions which would be allowable * * * for the taxable year without regard to whether or not such activity is engaged in for profit" under section 183(b)(1).

Petitioners have failed to satisfy their burden of proving that any amounts were paid as State and local real property taxes. Accordingly, no deductions are allowable under section 183(b)(1).

With respect to deductions allowable under section 183(b)(2), as noted *supra*, Brooksville agreed to pay $860,000 for the equipment, payable $35,000 in cash and $825,000 by a nonrecourse note bearing 6 percent annual interest. Brooksville included the amount of the nonrecourse note in the equipment's basis for depreciation purposes and claimed deductions for depreciation on its tax returns for its years 1976 through 1983 in the total amount of $860,000 (Brooksville deducted $30,714, $177,704, $139,625, and $109,705 as depreciation on the equipment on its tax returns for 1976, 1977, 1978, and 1979, respectively).

The parties stipulated, and we found as fact, that no payments of principal were ever made by Brooksville with respect to the note. On two different occasions (March 3, 1980, and February 10, 1981), Cofman confirmed, at the request of Phillips and of Robert C. Fink, that no payments of principal or interest had been made on the said note as of December 31, 1980 (see our findings of fact, *supra*). We are satisfied, on the record before us, that no interest payments were made on the note.[23] We are also satisfied that the note is purely illusory and should not be taken into account for depreciation purposes.

Pursuant to the terms of the franchise agreement, BFM sold all of its right and interest in the franchises to Brooksville for the sum of $25,000. According to Rutter's report, the value of a franchise in the mid-1970's was in the

---

[23]Entries in the accountant's work papers purportedly used in the preparation of Brooksville's tax returns for 1976, state that $8,600 of the $196,749.92 paid by Brooksville to BFM were allocated to interest expense (the said work papers seem to state that $4,300 of the $8,600 was prepaid interest). We note however, that: (1) The checks signed by Cofman and dated December 7, 1976, did not indicate the purpose for which they were being paid, (2) Cofman, as general partner, entered into the transactions here in issue and knew what the checks were being paid for, (3) Cofman confirmed in writing on two separate occasions that no payments of principal or interest had been made on the nonrecourse note signed by him as

range of $50 to $75 *per home passed* for franchises that were brokered or sold. The fair market value, assuming the sale of an undeveloped franchise would be, according to Rutter, approximately $200,000 to $375,000. We are satisfied that as of December 7, 1976, the value of the franchises did not exceed $93,550, as we have found. Petitioners have failed to prove that the franchises were not likely to be renewed. See *Chronicle Publishing Co. v. Commissioner*, 67 T.C. 964 (1977). "An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation." Sec. 1.167(a)-3, Income Tax Regs. Accordingly, no depreciation is allowable for any of the years in issue with regard to the franchises. *Toledo T.V. Cable Co. v. Commissioner*, 55 T.C. 1107 (1971), affd. 483 F.2d 1398 (9th Cir. 1973).

Pursuant to the subscriber agreement, Brooksville acquired the right to service the subscribers to the CATV system. Brooksville was provided with a list of the names and addresses of the said subscribers. The stated consideration was paid $40,000 in cash and a nonrecourse note, in the amount of $35,000 payable to BFM, for a total of $75,000. No payments of principal or interest were made on the note. Brooksville deducted the $40,000 cash payment on its 1976 tax return and $17,500 in its tax returns for 1977 and 1978. No depreciation or amortization was claimed. The Brooksville system had no more than 739 subscribers and the number of houses passed did not exceed 1,871 as of December 7, 1976. We are satisfied that the value of the subscriber rights and list did not exceed $22,170 as of December 7, 1976. As to the deductions for 1977 and 1978, the failure of Brooksville to make any such payments eliminates the claimed deductions without the need for further discussion. As to the year 1976, assuming, arguendo, that $40,000 of the unidentified payments which we have found for that year are allocable to the subscriber list, and further passing the point that the subscriber list had a value not in excess of $22,170, as we have found, such list was nevertheless a capital asset whose cost would have to be capitalized and depreciated over its expected

---

partial payment for the equipment. We also note that on brief, petitioners admit that no such payments were ever made.

useful life (secs. 167 and 263), so that the expense deduction claimed in Brooksville's 1976 return was improper.

Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. No deduction is allowable with respect to goodwill. Sec. 1.167(a)-3, Income Tax Regs. If an intangible asset is known from experience or other factors to be of use in the business for only a limited period of time, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Sec. 1.167(a)-3, Income Tax Regs.

The subscriber list herein has no ascertainable value separate and apart from goodwill, and is nondepreciable.[24] See *General Television, Inc. v. United States,* 449 F. Supp. 609 (D. Minn. 1977), affd. 598 F.2d 1148 (8th Cir. 1979). We are satisfied that in this case, like the taxpayer in *General Television, Inc. v. United States, supra,* Brooksville purchased more than the right to service the subscribers or a mere list which could be used to identify actual and potential customers; it purchased customer structures which included the expectancy of continued patronage. "Therefore, because the purchases of the subscriber lists were actually purchases of customer structures with the expectancy of continued patronage and because the expectancy of continued patronage is the essence of goodwill, the subscriber lists constitute non-depreciable goodwill." *General Television, Inc. v. United States,* 449 F. Supp. at 612. See *Northern Natural Gas Co. v. United States,* 470 F.2d 1107 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973).

Even assuming, arguendo, that the subscriber list herein has an ascertainable useful life separate and apart from goodwill, petitioners must also prove that the said list has a limited useful life, the duration of which can be estimated

---

[24]In *Manhattan Co. of Virginia, Inc. v. Commissioner,* 50 T.C. 78 (1968), this Court held that the taxpayer was entitled to depreciation deductions for that portion of lists—containing the names and addresses of a number of home-pickup-and-delivery laundry customers purchased by taxpayer from another laundry company—that did not represent continuing value of the lists, including any value in the nature of goodwill. The taxpayer in *Manhattan Co.* however, introduced evidence showing that it could expect to lose approximately 20 percent per year of the typical customers acquired by them from the lists. From that and other evidence in the record, this Court concluded that the customer lists had a useful life of approximately 5 years. No such evidence has been present herein.

with reasonable accuracy, in order to be entitled to a depreciation deduction. Petitioners presented no evidence of the actual life of the customer list, nor any expert testimony, as to CATV industry norms or guidelines. The record contains, however, Rutter's uncontradicted expert testimony that "A cable television subscriber list tends to have an infinite life." It follows that no deductions with respect to the subscriber list are allowable.

With respect to the warranty agreement, the situation is somewhat the same. Of the total price of $220,000, there is no evidence that the two payments of $100,000 apiece, due in 1977 and 1978, respectively, were paid, and the deductions claimed in Brooksville's returns for these amounts are accordingly not allowable. With respect to the $20,000 payment in 1976, assuming again that this was part of the total unidentified payments made by Cofman on December 7, 1976, such payment was nevertheless for the acquisition of a capital asset with a useful life of over 1 year, and no deduction for such amount would be allowable for 1976. Instead, such amount should be capitalized and amortized or depreciated over its useful life, beginning with December 7, 1976, subject to the limitations of section 183(b)(2).

Under the management agreement, BCM was to operate and maintain the CATV system and to transact all business relating to the system for the period between December 7, 1976, and December 31, 1988. Brooksville was to pay BCM a total of $175,000 for the period from December 7, 1976, to December 31, 1978, and additional amounts, for years after 1978, as described in our findings of fact, *supra.* It was very unusual within the cable industry for the buyer of a CATV system to retain the seller, or a related company, to manage the system during the years in issue, and for the manager to be required to pay for operating expenses and debt service in excess of operating revenues. The fees agreed upon by Cofman, as general partner of Brooksville, and BCM were clearly excessive.[25] The typical management fee in 1976 was 3 to 5 percent of operating revenues. Pursuant to the provisions of the management agreement,

---

[25]We note that the projected gross revenues for 1976, 1977, 1978, and 1979 were $13,200, $201,000, $315,000, and $378,000. The said projection assumed the introduction of pay TV as of 1976 and a steady increase in the number of subscribers. See our findings of fact, *supra.*

BCM was given an option to acquire Brooksville's rights in the system and the franchises, exclusive of all equipment, subsequent to January 1, 1983, and prior to January 1, 1985, upon payment of their fair market value. It was highly unusual for the manager of a CATV system to be given an option to acquire the system during the years in issue. For purposes of the Rule 155 computation, the management fees are deductible to the extent that (1) their payment has been substantiated, (2) within the limitations stated herein, and (3) as limited by section 183(b)(2).

The noncompetition agreement provided that BFM was not to compete with the Brooksville CATV system directly or indirectly nor to operate a CATV system within the city of Brooksville and the areas of Hernando County *in which the system existed as of December 7, 1976*, for the period between December 7, 1976, and December 31, 1979, in consideration for Brooksville's payments of $45,000 on December 7, 1976, January 2, 1977, and January 2, 1978. Brooksville deducted $45,000 in its returns for 1976, 1977, and 1978 for "noncompetition fee." No depreciation or amortization was claimed. We note, however, that the confidential memorandum stated that BFM and/or its affiliates were constructing CATV systems to be located in the Hernando County area, in areas franchised to the partnership, and that the principals and employees of BCM were active in the management of other CATV systems, some of which were located in the Hernando County area. We are convinced, and so hold, that the noncompetition agreement did not have a value in excess of $10,000 as of December 7, 1976. As to the deductions for 1977 and 1978, therefore, Brooksville's failure to prove that any payments were made in connection with the noncompetition agreement eliminates the claimed deductions without the need for further discussion. Even assuming, arguendo, that $45,000 of the payments which we have found were made in 1976 were allocable to the noncompetition agreement, the cost of a contract eliminating competition is a capital asset. Thus Brooksville may amortize the value of the said agreement ($10,000) over its useful life, within the limitations in section 183(b)(2), as determined in the Rule 155 computation. See *Throndson v. Commissioner*, 457 F.2d 1022 (9th

Cir. 1972), affg. 51 T.C. 306 (1968); sec. 1.167(a)-3, Income Tax Regs.

Brooksville also claimed deductions for promotion and advertising, contract labor, rent, vehicle expenses, utilities, office expenses, promotional fees, consulting fees, insurance, telephone, travel and entertainment, pole rental, maintenance and supplies, computer service, and data processing for 1977 and/or 1978[26] (see our findings of fact, *supra*).

In 1977, Brooksville paid $10,500 to Cannon, the attorney who wrote the tax opinion. Section 709(a) provides that no deduction shall be allowed to a partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. Section 709(b) provides for the amortization of specified organization expenses if the partnership so elects.[27] Syndication expenses, including "legal fees of the underwriter or placement agent and the issuer * * * for securities advice and for advice pertaining to the adequacy of tax disclosures in the prospectus or placement memorandum for securities law purposes" are not subject to the election provided in section 709(b) and must be capitalized. Sec. 1.709-2(b), Income Tax Regs. We are satisfied that the fees paid to Cannon for his preparation of the tax opinion were incurred to promote or facilitate the sale of the partnership interests, and constitute syndication expenses and are, therefore, not deductible. Sec. 709(a); *Johnsen v. Commissioner*, 83 T.C. 103 (1984), supplemental opinion 84 T.C. 344 (1985); *Surloff v. Commissioner, supra.*

We are also satisfied that the commissions paid in 1977, presumably for the sale of partnership interests, and of consulting fees paid to Alron, constitute syndication expenses and their deduction is also precluded by section 709(a).

Amounts paid, in 1977, to Cofman for "exchanges" are unexplained by this record. Deductions are a matter of

---

[26]We do not consider Brooksville's claimed deductions in regard to the aforementioned expenses for 1976 and 1979. Since no gross receipts were reported by Brooksville in 1976 or 1979, sec. 183(b)(2) does not afford any benefits to the partnership. We also note that all issues involving the taxable year 1979 have been settled by the parties.

[27] Sec. 709(a) applies to taxable years beginning after Dec. 31, 1975. Sec. 709(b) applies to amounts paid or incurred in taxable years beginning after Dec. 31, 1976. Sec. 213(b), (f)(1), (3), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1547-1549. Thus sec. 709(b) is not available to Brooksville for 1976. See sec.. 1.709-1(a), (b), Income Tax Regs.

legislative grace, and a taxpayer seeking a deduction must be able to pinpoint to an applicable statute and show that he comes within its terms. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934). Petitioners have failed to prove that these amounts are deductions which would be allowable under this chapter if the activity herein was engaged in for profit, within the meaning of section 183(b)(2), and they are, therefore, not deductible.

Cofman, as general partner, paid $38,000 to himself for "general partner's fees" in 1977. According to the unexecuted partnership agreement, Cofman was to receive $1,000 as a management fee in 1977. We have found that Cofman devoted a minimum amount of time to his duties as general partner of Brooksville. But for two reports to the limited partners, dated November 16, 1977, and July 7, 1980, this record is devoid of any evidence that Cofman performed any services as manager of the partnership, and hence, that the amounts paid to Cofman represented reasonable compensation. Petitioners have the burden of proof with respect to such issues. They have failed to adduce evidence in support of the deductibility of amounts paid to Cofman as general partner's fees. Accordingly, no deduction is allowable.

Other amounts claimed and not substantiated are also disallowed for 1977. Journal entries in the accountant's work papers are not probative evidence that the claimed deductions were actually paid. Petitioners have failed to sustain their burden of proof as to these amounts. The substantiated (see our findings of fact, *supra*) and otherwise deductible amounts are allowed to the extent provided by section 183(b)(2), for purposes of the Rule 155 computation herein.

There are only two checks in evidence for the year 1978, in the amounts of $625 and $3,000, payable to John Volatile and to Cofman, for office expenses and management fee, respectively. We find that the $625 claimed for office expenses are deductible, subject to the limitations in section 183(b)(2), as determined in the Rule 155 computation. The $3,000 paid to Cofman as a management fee are not deductible. Petitioners have failed to prove that any services were provided by Cofman in exchange for the said

payment. Furthermore, according to the unexecuted partnership agreement, only $2,000 were to be paid to Cofman in 1978. As to other amounts claimed as deductions for 1978, there are no checks, money orders, or any other proof of payment in evidence. The entries in the accountant's work papers are not probative evidence that the claimed expenses were actually paid. These amounts are therefore not deductible by Brooksville.

### Issue 2. Investment Tax Credit

Section 38 provides that a credit against income tax is allowed to a taxpayer for qualified investment in certain property. The credit is allowable for property with respect to which depreciation is allowable and which has a useful life of 3 years or more. Sec. 48(a)(1). Depreciation is allowable only for property used in the trade or business or held for the production of income. Sec. 167(a). Our determination that Brooksville did not engage in the activities herein with the primary purpose and intention of making a profit, viz, that the partnership was not engaged in a trade or business or in an activity for which deductions are allowable under section 212(1) or (2) is dispositive of this issue. See *Pike v. Commissioner*, 78 T.C. 822 (1982), affd. in an unpublished opinion 732 F.2d 164 (9th Cir. 1984).

As a result of our disposition of the issues presented herein and of the application of the provisions of section 183(b)(2), some deductions may be allowable which are attributable to depreciation and or amortization. See sec. 1.183-1(b)(1) and (2), Income Tax Regs.; S. Rept. 91-552 (1969), 1969-3 C.B. 423, 490, to accompany H.R. 13270 (Pub. L. 91-172, 83 Stat. 487). The possibility that such deductions may be allowed, however, has no effect on our determination that no investment tax credit is allowable. Section 183(b)(2), by its terms, refers only to deductions and not to credits.

Property which qualifies for the credit allowed by section 38 is known as section 38 property. Sec. 1.48-1(a), Income Tax Regs. Section 1.48-1(b), Income Tax Regs., provides that:

Property (with the exception of property described in section 48(a)(1)(F) and paragraph (p) of this section) is not section 38 property unless a

deduction for depreciation (or amortization in lieu of depreciation) with respect to such property is allowable to the taxpayer for the taxable year. A deduction for depreciation is allowable *if the property is of a character subject to the allowance for depreciation under section 167* * * *  [Emphasis added.]

Therefore, the determination with respect to the allowability of an investment tax credit must be made only by reference to sections 38, 46, 48, 167, and 168, without regard to the provisions of section 183.

Petitioners make additional contentions which are meritless and deserve no further discussion. In view of our resolution of the issues herein, we need not reach any of respondent's other arguments for disallowing petitioners' deductions relating to Brooksville for the years 1976 through 1979.

To reflect the foregoing, as well as concessions made by the parties,

*Decisions will be entered under Rule 155.*