DENNIS R. SEEBOLD AND BERENEICE SEEBOLD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seebold v. Commissioner
Docket No. 11391-86.
United States Tax Court
T.C. Memo 1988-183; 1988 Tax Ct. Memo LEXIS 208; 55 T.C.M. (CCH) 723; T.C.M. (RIA) 88183; April 28, 1988
Melvin Hoffman, for the petitioners. Vijay Rajan, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND *209 OPINION FAY, Judge: For petitioners' 1982 taxable year, respondent determined a Federal income tax deficiency in the amount of $ 6,615.20, a section 6661 addition to tax in the amount of $ 661.52, a section 6653(a)(1) addition to tax in the amount of $ 330.76, and a section 6653(a)(2) addition to tax in the amount of 50 percent of the interest due on the deficiency. The primary issue is whether petitioners' horse farming activity was an activity engaged in for profit. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations and stipulated exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Marseilles, Illinois, when the petition herein was filed. In 1979, petitioners purchased four horses for pleasure. As a result of purchasing these four horses and after consulting with several people, petitioners decided to go into the Appaloosa horse farming business in 1980 under the trade name "Triple S." Petitioners wanted a source of income for later years and thought that Triple S could provide that source of income. Petitioners were aware that several years were required before Triple S could *210 be expected to become a profitable operation. From 1980 through 1986, both petitioners worked full-time jobs not related to their horse farming activities, but each still managed to work at least 40 hours per week at their horse farming activities. In 1987, petitioner husband's work routine did not change, but petitioner wife began working exclusively at the horse farming activities. Petitioners, having generally not hired farmhands, have personally performed substantially all labor associated with the horse farming activities. Petitioner wife believes she and her husband have a certain amount of talent and ability to handle and work with horses. In connection with going into business, petitioner wife read books on horse breeding, management, small farm operations, and tax matters relating to horse activities. Petitioners subscribe to approximately ten horse-related periodicals. Petitioner wife attended a horse clinic conducted by Linda Tellington Jones and viewed videocasette tapes dealing with horse farming businesses and related activities. Petitioners discussed horse breeding activities with Danton Hirsh, a breeder of standard bred and thoroughbred horses in Yorkville, Illinois, *211 and with Pat and Beth Chase, owners and operators of an Appaloosa horse farm. Mr. Hirsh and Mr. and Mrs. Chase informed petitioners that it could take 10 years for a horse farm to become profitable. Mr. and Mrs. Chase further emphasized the importance of acquiring a quality Appaloosa stallion. Petitioners consulted with their Certified Public Accountant ("CPA"), Richard Roenfeld, about going into business. Petitioners regularly engaged the services of Dr. Dan Lindy of the Ottawa Veterinarian Hospital and regularly kept records of veternarian services. The following table reflects petitioners' buying and selling activities with respect to their Appaloosa horses: HORSE
PURCHASED
COST
SOLD
PRICE
Stormy
1/80
$   650
6/80
$   600
Mr. Frickles
4/80
675
3/81
675
Babe
10/80
850
12/81
680
Candy
3/81
675
4/81
675
Miss Double Sugar
4/81
850
2/83
1,000
Blondy
7/81
450
10/82
650
Spider Speed
11/81
1,512
-- -- Clover Kay
4/82
400
8/87
114
Hi & Bright
5/82
775
10/82
850
Jolene
5/82
1,000
3/86
500
Royal Pasquinel
2/83
500
4/83
550
Venture
4/83
450
8/83
850
Dakota
8/84
456
10/84
240
Bay Store
3/86
1,400
10/86
135
Susie
3/87
2,000
-- -- *212 Neither petitioners nor petitioners' three children, aged 22, 21, and 17 during 1982, the year at issue, utilized any of the horses listed above for pleasure. Mr. Frickles, a stallion, was purchased in 1980 for breeding purposes but was sold in 1981 because he failed to perform properly. Spider Speed, also a Stallion, was purchased in 1981 to replace Mr. Frickles. Spider Speed was to begin training in 1982, but suffered a broken jaw while breeding a mare and did not begin training until 1983. He was trained at the Ha-Dar-Ca Stable by Hadley Campbell. Mr. Campbell is an Appaloosa trainer with an excellent reputation having trained several world champions. In 1984, Spider Speed completed training with Mr. Campbell and placed 13th at the World Show in junior cutting. Spider Speed is now worth approximately $ 25,000 and has become a symbol for Triple S. Triple S advertised regularly, initially soliciting stud engagements for Spider Speed at $ 250. In 1984, the stud fee for Spider Speed was raised to $ 400. The advertisements offered for sale horses owned by Triple S and offered breaking, training, riding, and boarding services. At the time of trial, five horses were *213 boarded at Triple S. Since Triple S began operations, 20 foals have been born. The following table reflects Triple S' foaling activity: NAME
BORN
SOLD
PRICE
See Bold Thunder Bay
4/81
8/84
$ 1,500
Son of Babe
8/82
3/83
500
Annie
8/82
10/82
500
Blazer
8/82
3/83
500
Bright Eyes Colida
5/82
8/86
1,500
See Bold Sierra
4/83
3/86
600
See Bold Spider Lace
4/83
6/84
1,200
Black Widow
2/84
7/85
1,400
See Bold Hard Times
4/84
3/87
2,750
Little Miss Q-Tip
6/84
3/86
300
See Bold Outlaw
4/85
10/86
135 Bright Eyes
2/86
DIED
Red
3/86
-- -- Jolene
3/86
DIED
Clover
3/86
DIED
Sudden Success
5/86
12/86
500
Annie
2/87
2/87
1,200
Sable
3/87
-- -- Starbuck
5/87
-- -- Mad Max
6/87
-- -- Since 1980, Triple S' activities were conducted on five acres of land owned by petitioners and 10 acres of land leased by petitioners. In 1981, a barn with six stalls, a stallion stall, and a foaling stall was constructed. At the time of trial, petitioners were in the process of purchasing an additional 10 acres of land and were planning to build a 7,200 square foot barn with 24 stalls, a lounge area, *214 a viewing area, and a storage room. The losses and projected income for Triple S from 1982 through 1987 are reflected below: Year
Loss
Projected Income
1982
$ 24,234.44
--
1983
31,432.59
--
1984
36,505.59
--
1985
[1] * --
1986
3,907.17
--
1987
--   $ 8,000 - 10,000 [2]
During 1982, petitioners' only source of income was wage income in the amount of $ 44,938. The record does not reveal for later years that petitioners acquired another source of income, other than Triple S, or that petitioners' wage income increased substantially. During the year at issue, 1982, petitioners did not maintian a separate checking account for Triple S' activities. However, petitioner wife, who had previous bookkeeping experience, maintained ledgers with respect to Triple S' activities. Such ledgers were found by petitioners' CPA to be adequate to prepare petitioners' Federal income tax returns. Triple S at one time raised *215 turkeys and geese. In 1983, petitioners determined that raising turkey and geese was not profitable and Triple S ceased engaging in such activity. Petitioners deducted on their 1982 joint Federal income tax return Triple S' 1982 loss of $ 24,234.44. Respondent disallowed the claimed deduction and determined the deficiencies and additions to tax referenced above. ULTIMATE FINDING OF FACT Petitioners' Appaloosa horse farming activity was an activity engaged in for profit during the year in issue. OPINION The primary issue for our determination is whether petitioners' horse farming activity was an "activity not engaged in for profit" within the meaning of section 183. Section 183, in general, limits an individual's deductions attributable to an activity to the income from such activity "if such activity is not engaged in for profit." Section 183(c) defines an activity "not engaged in for profit" as any activity other than one with respect to which deductions are allowable pursuant to section 162 or section 212(1) or (2). [3] Therefore, before we can apply section 183, we must first determine whether the deductions from the activity are allowable under section 162 or 212. *216 Deductions are allowable under section 162 for the expenses of carrying on an activity which constitutes a trade or business. [4] Deductions are allowable under section 212(1) and (2) for the expenses incurred in connection with an activity engaged in for the production or collection of income or for the management, conservation or maintenance of property held for the production of income. [5]
The threshold test for determing whether an activity constitutes a trade or business so as to allow a deduction for expenses under section 162 is whether the primary purpose and intention of *217 the taxpayer in engaging in the activity is to make a profit. Hager v. Commissioner,76 T.C. 759, 784 (1981); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. in an unpublished opinion, 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Churchman v. Commissioner,68 T.C. 696, 701 (1977). It is not crucial that the expectation of profit be a reasonable one, but the taxpayer must have a bona fide objective of realizing a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1083); Golanty v. Commissioner, supra.
Petitioners bear the burden of proving that they engaged in their horse farming activity with the requisite profit objective. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We have found as the ultimate finding of fact that such was the case. The issue of whether an activity was engaged in *218 for profit is one of fact to be resolved on the basis of all the surrounding circumstances. Finoli v. Commissioner,86 T.C. 697, 722 (1986); Beck v. Commissioner,85 T.C. 557, 570 (1985); Flowers v. Commissioner,80 T.C. 914, 931-932 (1983). However, in determining whether taxpayers engaged in the activity with the requisite profit objective, we give greater weight to objective factors than to the taxpayers' statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra;Flowerrs v. Commissioner, supra.
Section 1.183-2(b), Income Tax Reg., provides a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Allen v. Commissioner,72 T.C. at 33; Benz v. Commissioner,63 T.C. 375, 382-383 (1974). These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the *219 assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and, (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986). We first consider whether petitioners conducted their horse farming activity in a businesslike manner; we believe they did. Although petitioners did not maintain a separate checking account for Triple S' activities, petitioner wife, relying on her past bookkeeping experience and the advice of petitioners' C.P.A., maintained adequate records of Triple S' activities. The maintenance of complete and accurate books and records indicates that an activity is carried on in a businesslike manner. Sec. 1.183-2(b)(1), *220 Income Tax Regs. Further, petitioners discontinued their turkey and geese operations when they realized such operations were not profitable. Discontinuation of a non-profitable branch of operations indicates that the activity was conducted in a businesslike manner. Petitioners, particularly petitioner wife, went to great lengths to develop their expertise in Appaloosa horse farming. Although petitioners had little prior experience with horses, they sought the advice of pesons knowledgeable about Appaloosa horse farming operations; Mr. Hirsh, Mr. and Mrs. Chase, and Mr. Campbell of the Ha-Dar-Ca Stable. Further, petitioners regularly engaged the services of a C.P.A. and a veterinarian. In furtherance of Triple S' activities, petitioner wife read many books, viewed video cassette tapes, and attended a horse clinic. Petitioners subscribed to several periodicals covering areas relating to Triple S' activities. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with those who are expert therein, may indicate that the taxpayer entered into the activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs.
We next *221 examine the amount of time and effort petitioners devoted to their horse breeding activity. Petitioners each devoted more than 40 hours a week to the horse farming operations. In addition, beginning in 1987, petitioner wife began working exclusively at Triple S' activities. We now consider whether petitioners expected that the assets they used in their quarter horse breeding activity would increase in value. Petitioners expected that at least one of their horses, Spider Speed, would appreciate in value. Indeed, one of the major purposes of Spider Speed's training at Ha-Dar-Ca Stable and competition in the World Show was to enhance Spider Speed's value and the amounts which could potentially be charged for stud fees and offspring. Prior experience in similar or dissimilar activities is also to be considered. Petitioners had little or no experience with any similar activities, although petitioner wife's prior bookkeeping experience was certainly useful to Triple S' activities. Further, petitioner wife believes that she and her husband have a particular talent in working with horses. The history of losses resulting from the activity bears upon petitioner's profit motive. However, *222 the purpose to make a profit may exist even in the fact of a history of losses unaccompanied by any gains whatever. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 279 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967); White v. Commissioner,23 T.C. 90 (1954), affd. 227 F.2d 779 (6th Cir. 1955), cert. denied 351 U.S. 939 (1956). This is particularly true when such losses occur in the formative years of a business, especially one involving horse farming. Bessenyey v. Commissioner, supra.Here the predictable start-up losses had been substantially reduced in 1985 and 1986, and by 1987, reversed with a projected $ 8,000 to $ 10,000 gain. We next consider whether, and to what extent, petitioners derived occasional profits from the activity. petitioners derived no profit from their horse farming activity from 1980 through 1986, but did project an $ 8,000 to $ 10,000 profit for the 1987 taxable year. This projected profit does not appear to be an occasional erratic profit, but rather a step in the maturing process of a young enterprise and is indicative of a profit *223 objective. Petitioners' income from other sources when compared with the losses generated from Triple S' activities was relatively modest, suggesting that Triple S' activities were engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Further, petitioners intended Triple S to be a source of income for later years, further suggesting a profit objective. Finally, we consider whether personal pleasure or recreation was involved in the activity. Petitioner wife acknowledged that she and petitioner husband purchased four horses for pleasure in 1979. However, none of the horses purchased for Triple S' activities in 1980 and later years were utilized by petitioners or their children for pleasure. Further, a horse farming operation, particularly on the scale at which petitioners conducted it, required a great deal of effort, devotion, and hard work. Based upon the record as a whole, we conclude that petitioners engaged in their horse farming activity with a bona fide profit objective and are thus entitled to deduct their expenses pursuant to section 162. Having held for petitioner on the primary issue, we similarly hold for petitioner on the issues relating to the section *224 6661, section 6653(a)(1), and section 6653(a)(2) additions to tax because there is no "substantial understatement," see sec. 6661(b), or "underpayment," see sec. 6653(c). To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. The record does not reveal the amount of the 1985 loss but does reveal that the 1985 loss was substantially less than the 1984 loss. ↩
2. This is projected income based on Triple S' books and records as of October 1, 1987.↩
3. Section 183(c) provides as follows: (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. ↩
4. Section 162 provides, in relevant part, as follows: (a) IN GENERAL. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * ↩
5. Section 212 provides, in relevant part, as follows: In the case of an individual there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * ↩