JOHN H. LEWIS AND NANCE LEWIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewis v. Commissioner
Docket No. 20888-88
United States Tax Court
T.C. Memo 1992-420; 1992 Tax Ct. Memo LEXIS 447; 64 T.C.M. (CCH) 269; July 27, 1992, Filed *447 Decision will be entered under Rule 155. For Petitioners: Sheldon S. Baker, Shahen Hairapetian, [1] and Eric Olson. For Respondent: Darren M. Larsen. GOFFE
GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes for 1984, 1985, and 1986 in the amounts of $ 17,829.00, $ 13,324.57, and $ 20,736.00, respectively. After concessions relating to the 1985 real estate activity of Nance Lewis, the sole issue for decision is whether petitioners' sailboat chartering activity was "not engaged in for profit" within the meaning of section 183. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *448 of facts and accompanying exhibits are incorporated by this reference. Petitioners John H. and Nance Lewis, who filed joint Federal income tax returns as husband and wife for the years in issue, resided in Glendale, California, at the time their petition was filed. John H. Lewis (hereinafter petitioner) learned to sail in the late 1960s. During the 1970s, he participated in three 10-day bare boat charters in the Caribbean on sailboats averaging 40 feet in length. [3] Prior to 1984, he also sailed on large sailboats in Chesapeake Bay for a total of about 60 days. Nance Lewis enjoys sailing, but not as much as her husband does. Petitioner, who listed his *449 occupation as "physicist" on his income tax returns, has an undergraduate degree in mechanical engineering and a Ph.D. in the applied physics area. His background includes training and experience in mathematics and statistics. In 1984, he held a business and planning position with a division of the Atlantic Richfield Company (ARCO) in Woodland Hills, California, where his responsibilities included budgeting, monthly performance reporting, and investigation of new business opportunities from both financial and technical standpoints. Some of the opportunities he evaluated and recommended to upper management involved entrepreneurial products or processes of undeveloped potential, which, when absorbed into ARCO, would be expected to lose money for several years of growth before becoming profitable. Petitioner's working hours at ARCO were predictably regular, with evening and weekend demands very rare and travel only minimal. Although petitioners lived in Glendale, which is just north of Los Angeles, they were especially fond of a coastal region northwest of Los Angeles, which encompasses the cities of Oxnard, Ventura, and Santa Barbara. Woodland Hills, where ARCO was located, lies *450 between Glendale and Ventura. While at ARCO, petitioner had intensively studied several possible locations for a factory and had decided that this coastal region, from a demographics and economic growth perspective, was best suited to the factory. Off the coast was Channel Islands National Park, designated as such by Congress in 1980. Petitioner knew of the potential development of this national park from his work at ARCO. At one time, he believed that development would be of a scale and type appealing to recreational sailors, but an eventual emphasis on a nature conservancy, apparent to petitioner in 1984, largely precluded that development. Nance Lewis was a full-time residential real estate agent for the Coldwell Banker office in Glendale during the years in issue. Although she could have worked out of the Santa Barbara or Ventura office of Coldwell Banker, and although petitioner felt that he could find a job in the Ventura area to match his qualifications, they never relocated from Glendale. In October 1984, petitioner was laid off from ARCO. He took a job later the same month with Hughes Aircraft Company (Hughes Aircraft) at a substantial cut in pay. Compared to ARCO, *451 this new position entailed a longer commute, longer and less predictable hours, and much more travel. Hughes Aircraft, located in Long Beach, California, southeast of Los Angeles, was much farther away than ARCO was from Ventura, a total of over 100 miles in petitioner's estimation. At both ARCO and Hughes Aircraft, petitioner had some experience with profit and loss responsibility for specific projects and product lines. At the time petitioner first considered purchasing a large sailboat, his health was excellent. Because he planned to perform much of the maintenance work himself, he thought that continuing good health was necessary. He also believed that conducting a full-time business required good health. In late 1983, however, he injured his neck in an automobile accident. Despite initial improvement through physical therapy, he suffered a serious relapse in early 1985 that kept him from work for 3 or 4 weeks and curtailed his airplane travel for a year. His neck still gives him occasional problems. Nonetheless, throughout the years in issue, he was able to sail and performed at least some of the cleaning and mechanical maintenance work himself. On March 23, 1984, petitioners *452 signed a sales agreement with Argonaut Yacht Sales, Inc. (Argonaut), for a 1984 Cheoy Lee Pedrick 41-foot sailboat. The agreed price was $ 129,000 net of State sales tax. Petitioner purposely selected a boat that was roomy, well-equipped, and able to sleep six comfortably, yet was safely operable by a husband and wife alone. After several inspections and two sea trials, petitioners formally accepted delivery of the boat, which they named Ta'te Tate', by executing an acceptance agreement on August 30, 1984. After investigating several alternatives, petitioner chose Ventura Harbor as a docking site because of its extensive facilities, convenience to the Channel Islands, and safe approach from the sea. Petitioner believed that the marina he selected, Ventura Isles Marina, prohibited the use of its slips for commercial purposes. On August 31, 1984, petitioners entered into a written charter agreement with Argonaut, which provided that Argonaut would charter Ta'te Tate' from petitioners at least 20 days per calendar year, at $ 100 per day, for sales demonstration and promotion purposes. Argonaut, which prepaid the $ 2,000 charter fee, warranted that its own insurance would cover *453 all damages and liabilities except those caused by petitioners' negligence. Argonaut agreed to give 2 days' notice prior to each charter and, upon boarding, to make a suitable notation in the on-board log. There was, however, no log book on board, and in 1985 petitioner informed Argonaut that advance notice was no longer necessary. The charter agreement provided for automatic renewal at the beginning of 1985 and 1986, each renewal to be accompanied by a $ 2,000 Argonaut prepayment. By its terms, the agreement was to terminate at the end of 1986 unless earlier terminated at the option of petitioners. They terminated the agreement in January 1986 at the request of Argonaut. The termination letter written by the president of Argonaut stated: "I very much appreciate your past cooperation in allowing us to sea trial and show your boat and trust our consultation services in return have been beneficial to your enterprice [sic]." Although not a part of the charter agreement, petitioners paid Argonaut $ 2,000 in both 1984 and 1985 shortly after receiving the prepaid charter fees. In October 1984, after submitting an application, petitioners received an employer identification number *454 from the IRS. At about the same time, they published in a Glendale newspaper and filed with the Clerk of Los Angeles County a fictitious business name statement in the name of Wind Spirit Charters. The two major bare boat chartering groups in late 1984 in the area around Ventura were Santa Barbara Sailing Association (SBSA) and Calypso Sailing Association (Calypso). Both SBSA and Calypso generally chartered boats that were owned by others; an individual owner and the chartering organization entered into a contract providing for some split of the charter revenue. The president of SBSA had written petitioner a letter in December 1983, which described the chartering operation of SBSA, attempting to persuade petitioner to charter his as yet unpurchased boat through SBSA. Calypso's fleet of charter boats in Ventura did not include any as large as petitioners' 41-footer. Petitioner investigated these chartering operations, and also spoke with other persons knowledgeable about the business, prior to March of 1984. At some point in 1984, petitioner prepared a handwritten set of schedules and computations showing cash-flow projections of revenues, expenses, and profits for 5 years of *455 a boat chartering activity. Although the two scenarios, "low case" and "mid case", do not differ in their expense projections for the first 4 years, the "low case" has lower revenues throughout than does the "mid case". The "low case" shows a profit of $ 4,367 in the fifth year, when projected revenues are based upon 30 weeks of charter fees, following annual losses of $ 11,200, $ 22,720, $ 19,606, and $ 13,061. The "mid case" shows a profit of $ 13,189 in the fourth year, when projected revenues are based upon 25 weeks of charter fees, following annual losses of $ 11,200, $ 18,220, and $ 12,106. Each scenario has "Argonaut" revenue of $ 2,000 per year for years 1 through 3 but no Argonaut expense. Each scenario has a loss exceeding $ 12,000 for a year with 10 weeks of charter revenue. It was petitioner's belief, based upon his investigation of the chartering business, that charter sailboats in the Ventura area were docked most of the time awaiting a charter. He was aware, in fact, that a typical sailboat was chartered for only 20 to 25 days per year. Petitioner obtained a pleasure boat insurance policy in 1984 from United Pacific Insurance Company (United Pacific) through *456 the insurance agency of Deyette, Christiansen & McCloskey. Mr. Christiansen, who wrote the policy, was a principal in the agency at the time and very knowledgeable about marine insurance. The insurance application form that Mr. Christiansen signed on June 27, 1984, reads in part, "If Vessel Used Commercially or Chartered, Explain:". The response line is blank. On August 27, 1985, petitioner signed a similar form which, in its completed state, again shows no response to the question about commercial use. Mr. Christiansen's handwritten notes concerning petitioner include a page that describes the boat, notes a value of $ 135,000 for the hull, and notes a protection and indemnity limit of $ 300,000. This same page also has a notation "(Charter --) 10". Petitioner's notes from his discussions with Mr. Christiansen include the following three points after the word "Charter": (1) "$ 35/day or 5% which is greater"; (2) "report prior to each charter"; and (3) "up to 10 days OK". Among the express restrictions in the policy itself was the following: "The boat must be used only for private pleasure purposes. It cannot be used for charter, hire, leased [sic], or any other commercial *457 use unless prior written consent has been obtained from us [United Pacific]." Any such request and consent would require an endorsement to the policy and an additional premium. As to the consequences of a violation, the policy stated: "If you violate any of these restrictions, your coverage will be suspended. We will not cover losses that occur while your boat is being used in any way that is prohibited under this Policy." Petitioner never provided notification of a specific charter. Petitioner collected samples of brochures, policy and procedure statements, and legal agreements from others already involved in the chartering business. He used these as models in developing his own documents, which had a Wind Spirit Charters letterhead. Included was an informational brochure entitled "Charter Policies", which, among other things, described Ta'te Tate', spelled out the fee structure (including reservation and security deposits), and displayed an area map. Although petitioners did some advertising, including flyers and mass mailings, they depended largely upon referrals and word-of-mouth networking in the yachting community. Petitioners used an answering service to cover their *458 home phone, which was also the phone for Wind Spirit Charters. Petitioner often delivered Ta'te Tate' to a charter client at the guest dock of the Ventura Yacht Club, of which he was a member, where the client received a detailed walk-through of the boat and discussed his qualifications. Petitioner took courses from the U.S. Coast Guard Auxiliary on topics such as seamanship and coastal piloting, and he used the tests, and others like them, as guidelines when he evaluated the sailing skills of people wanting to charter his boat. He supplied charter clients with informational brochures from the National Park Service and with other literature concerning safety and communications. Upon return of the boat from a charter, petitioner was not always there to meet it, but he would eventually inspect and clean it. The business checking account for Wind Spirit Charters was at First Interstate Bank, which had also lent petitioners most of the money to purchase the boat. This account was used for most of the operating and maintenance expenses, in addition to periodic repayments of the purchase loan. Petitioner kept a handwritten financial ledger, primarily in a single-entry bookkeeping *459 format, of inflows to and outflows from this business account. Although the ledger also included some checks written on petitioner's personal account, it was not a complete financial record of charters and associated expenses. At year end, for tax purposes, petitioner consolidated certain personal check amounts and credit card charges with the ledger amounts. Petitioners' tax accountant suggested that petitioner consider using more elaborate double-entry bookkeeping, but petitioner did not believe it necessary. Petitioner prepared and updated at home a handwritten log of charters during the years in issue, including some Argonaut charters. He was not precise and meticulous in this pursuit and, in one instance, failed to notice an omitted 4-day charter for almost a year, until after he had provided a copy of the log to an IRS examining agent. Although the log contains some of petitioners' noncharter trips, it does not include all such trips. Petitioner did not keep a contemporaneous log of all-purpose boat usage or maintenance. As shown by executed Wind Spirit Charters documents, petitioners' charter clients other than Argonaut were as follows: Name
Dates
Charter fees
Peter Ramirez
Nov. 17-18, 1984
$    400
Peter Ramirez
June 8, 1985
60
Howard Bradley
Aug. 3-4, 1985
500
W.T. Moffat
Nov. 17-18, 1985
500
Scott Vallerga
Mar. 20-23, 1986
1,000
Joel Landrum
May 23-26, 1986
1,000
Howard Bradley
July 12-13, 1986
500
Mr. & Mrs. Elliott
Dec. 13-14, 1986
500
*460 In addition, Donna Harmon chartered the boat for 4 days in August 1986 for $ 1,000. The document package used by petitioner typically included a reservation application, a skipper experience resume, and an itinerary, all to be completed and signed by the client. The client also signed a bare boat charter agreement and usually a certification of skipper experience and competency. The reservation application included the question, "How referred to us?", which Ramirez, Moffat, and Vallerga answered by mentioning some form of advertising. Bradley responded that he met the Lewises through ARCO, Landrum answered "W.T. Moffat", and the Elliotts responded that they were clients of Nance Lewis. The only three charter clients whom petitioners did not know ahead of time were Moffat, Landrum, and Harmon. On some occasions, petitioners test sailed Ta'te Tate' themselves to check on the state of the equipment and the operation of the various systems. They sometimes took real estate clients of Nance Lewis on sailing trips for no charge, including some overnight sails. [4] Nance Lewis generally considered these clients to be friends. Petitioners also took pleasure trips on occasion. *461 Petitioner was aware of two other sailboats of the same model as Ta'te Tate' that were resold sometime after original purchase. One, named Bonaventure, was in charter service at SBSA for about 3 years and was then resold for less than the original purchase price. In 1983 or 1984, petitioner heard from the president of SBSA that Bonaventure earned charter revenues of $ 800, $ 991, and $ 768 during August, September, and October, respectively. Bonaventure was one of SBSA's most popular boats for chartering. The owner of the other boat maintained it privately and resold it at above the list price. Petitioners were not counting upon appreciation in value when they purchased their boat. At the end of 1984, petitioners took no actions in response to then current circumstances. At the end of 1985, petitioners considered some options that might have a bearing on the chartering activity, including purchasing a second boat, placing Ta'te Tate' with a chartering organization like SBSA, and moving to Santa Barbara. They ultimately took none of these steps, but they did increase promotion activities. In 1986, petitioners applied for a $ 140,000 loan from First Interstate Bank for the *462 purchase of a 47-foot sailboat, but they did not carry through on the purchase. Petitioners discontinued their chartering activity at the end of 1988 without having earned a profit in any of the 5 years, but having fully recovered their original cost basis in the boat through claimed depreciation deductions. Petitioners' reported income from wages and interest was $ 110,448 in 1984, $ 83,692 in 1985, and $ 89,596 in 1986. On Schedule C of their income tax returns, they listed the following amounts relating to the chartering activity of Wind Spirit Charters: Income
Deductions
Net Loss
1984
$ 3,374
$39,218
$ 35,844
1985
3,060
55,832
52,772
1986
4,000
58,192
54,192 Of the claimed deductions, the Commissioner disallowed the entire amount for 1984, $ 40,911 for 1985, and $ 43,655 for 1986. [5] Also disallowed were investment tax credit amounts for the 1984 purchase of the sailboat and the 1985 purchase of an automobile, which was used by Nance Lewis in her real estate activity. *463 OPINION Because petitioners presented neither evidence at trial nor arguments on brief relating to the 1985 investment tax credit, we deem them to have conceded the matter. The sole remaining issue, which controls both disallowed deductions and the disallowed 1984 investment tax credit, is whether petitioners' sailboat chartering activity was "not engaged in for profit" within the meaning of section 183. For an activity not engaged in for profit, deductions attributable to the activity are allowable only to the extent provided in section 183. Sec. 183(a). Allowable deductions are those that would be allowable whether or not the activity was engaged in for profit, such as interest under section 163, and, if these deductions do not completely offset gross income from the activity, then other deductions to the extent of remaining gross income. Sec. 183(b). An activity is engaged in for profit if the associated deductions are allowable under section 162 or section 212(1) or (2). Sec. 183(c). The operative standard under section 183 is whether the taxpayer had an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), *464 affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). "Profit" in this sense means economic profit, independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Whether the requisite profit objective exists is determined by looking to all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity or continued the activity with the objective of making a profit. Dreicer v. Commissioner, supra at 645. Greater weight is given to objective facts than to a taxpayer's mere statement of his intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b), Income Tax *465 Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer on his advisors; (3) the time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses from the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and no single factor or even a majority of factors necessarily controls. Sec. 1.183-2(b), Income Tax Regs.
Some of the facts support petitioners' position that they engaged in the chartering activity with a profit objective. For example, despite an absence of direct experience in the chartering business, petitioner plainly had the education and employment background both to make an informed judgment regarding the profit potential of a start-up business and to manage a business with such potential. *466 In addition, he investigated the chartering business and the Ventura area prior to purchasing a sailboat of a size larger than any offered by Calypso. At some point early on, he prepared a 5-year projection for a boat chartering activity that showed a turn to profitability in year 4 or 5, depending on the scenario. Petitioners also set up and used a business checking account, applied for and received an employer identification number, and published a fictitious business name statement. They collected samples of brochures and documents from people already in the chartering business and used them as models for Wind Spirit Charters. Petitioner also had his charter clients fill out forms and execute agreements covering a wide range of relevant and important matters. On the entire record, however, petitioners have failed to persuade us that their sailboat chartering activity was engaged in for profit within the meaning of section 183 for any of the years in issue. As we discuss in detail below, important considerations are that petitioners conducted the activity overall in an unbusinesslike manner and failed to react in a businesslike manner to changed circumstances. Also notable *467 are unexplained inconsistencies in the record and failures in proof. Petitioners rely heavily upon the purported similarity of their circumstances to McLarney v. Commissioner, T.C. Memo. 1982-461, and Dickson v. Commissioner, T.C. Memo. 1983-723. In those cases, this Court found that the taxpayers engaged in boat chartering activities for profit under section 183. We are, of course, not bound by decisions that have considered facts and circumstances unrelated to the Lewises. Regardless, the facts in both McLarney and Dickson are readily distinguishable. A brief discussion of some of the distinctions will serve to introduce and highlight specific weaknesses in petitioners' position. In McLarney, for tax year 1977, we emphasized four factors in combination as the basis for a profit-objective conclusion. At least two of the four are lacking here. Specifically, unlike the taxpayers in McLarney, who switched from a passive exclusive leasing arrangement to nonexclusive leases supplemented by taxpayer participation, petitioners did not significantly alter an unprofitable method of operation. Attempted changes to improve profitability *468 are indicative of a profit objective. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs. Further, Mr. McLarney spent substantial time and energy on a regular basis to operate the activity, which petitioners here did not. Although not one of the four primary factors, we also emphasized that the McLarneys' personal use of the boat was small, both in absolute terms and relative to the business uses. In the case before us, petitioners' vague testimony, uncorroborated because of admittedly incomplete written records, does not compel us to reach the same conclusion regarding personal use. For tax year 1978, we found it significant that the McLarneys decided to withdraw from the chartering market and sell their boat when they could no longer effectively conduct the activity themselves. Mr. McLarney had been unforeseeably transferred by his employer across the country. Petitioners, on the other hand, made no significant operational changes even in the wake of petitioner's neck injury and change in employment. Dickson v. Commissioner, supra, is similarly distinguishable. As in McLarney, the taxpayer's *469 personal use of the boat was both established by the evidence and limited. Also, we found it important that, based upon conversations with boat owners and yacht brokers, Mr. Dickson actually and honestly expected his boat to appreciate in value. Petitioners here had no such expectation. Overall, on a day-to-day basis, petitioners did not conduct their chartering activity in a businesslike manner. They used a marina that petitioner believed prohibited commercial usage of its slips. They entered into a charter agreement with Argonaut that included certain provisions for petitioners' benefit (i.e., advance notice by Argonaut and an on-board log), yet they did not enforce compliance. They purchased a pleasure boat insurance policy that was apparently never upgraded to cover commercial usage. Petitioner's ledger of transactions flowing through the business checking account was knowingly incomplete, and petitioner did not keep a log of all-purpose boat usage. Also suspect is petitioners' decision to emphasize referrals and word-of-mouth networking as primary promotion techniques. These types of promotion activities are conveniently less expensive than more conventional advertising *470 methods. Further, petitioners could not have expected referrals to generate many prospects because over the course of the 3 years in issue, petitioners had only seven different charter clients. Networking does not seem conducive to great success either because petitioners, with their residence and employment elsewhere, did not spend most of their time in the Ventura area. Just as troubling as petitioners' day-to-day conduct of the chartering activity is their lack of businesslike adaptation to changed circumstances, a point already briefly noted in our discussion of McLarney v. Commissioner, supra. Despite petitioner's ability to evaluate profit potential and to manage a start-up business, the chartering activity was abandoned after 5 years without having generated a profit in any year. When asked at trial what he had done wrong, petitioner responded that the business plan was sound but that unforeseen circumstances kept the business from becoming successful. He emphasized (1) his change in employment from ARCO to Hughes Aircraft; (2) his neck injury caused by the automobile accident; and (3) the unfavorable development of Channel Islands National Park. *471 Although we do not doubt that each of these events adversely affected the profit potential of petitioners' chartering activity, we are only indirectly concerned about profit potential. Our direct focus is whether petitioners had an actual and honest objective of making a profit. The early timing of these three events, coupled with petitioners' failure to abandon or at least modify their purported business plan, strongly suggests that petitioners had no such profit objective. Even before the signing of the sales agreement with Argonaut in March 1984, petitioner had sustained his neck injury and was undergoing physical therapy treatment. Petitioner may have felt that he was on the road to recovery later in 1984, but his serious relapse in early 1985 could not have been ignored. Regarding petitioner's change in employment, he had already moved from ARCO to Hughes Aircraft prior to the first paying charter client (other than Argonaut) in November 1984. Finally, sometime before the end of 1984, petitioner had learned that Channel Islands National Park would not be developed in a way favorable to the recreational charter sailing for which Ta'te Tate' was supposedly suited. Although *472 petitioners argue on brief that abandonment of the chartering activity after committing to the boat purchase in March 1984 would mean "virtually certainly accepting a significant loss", this assertion is unsupported by the record. At least the first two of these factors, the neck injury and the job change, would seem to have been strong encouragement for petitioners to charter their boat more passively through an organization like SBSA or Calypso, but they never took that step. We can understand an owner's reluctance to entrust his boat to a chartering organization and thereby lose some control over preservation of the boat's condition. However, petitioners' contention that they were reluctant to split charter revenue with someone else is not persuasive. Even keeping all of the self-generated revenue to themselves came nowhere close to a break-even proposition, and petitioners never reached (exclusive of the wash arrangement with Argonaut) the annual 20 to 25 charter days that petitioner thought typical. Furthermore, Ta'te Tate' was apparently more than typical. A boat just like that of petitioners, Bonaventure, was one of SBSA's most popular, and petitioner heard sometime before *473 1985 that it generated charter revenues in three consecutive months. Consistent with Bonaventure's popularity is petitioner's testimony that Argonaut had many inquiries about the model and that Ta'te Tate' "at one point in time, it was the best charter boat available in that whole area, in that size range". Petitioner also testified that economic growth in the Ventura area, including tourism, has been substantial, as he had anticipated from the outset. Viewed from this perspective, petitioners appear to have purposely avoided untapped market potential, contrary to petitioner's claim that he did everything possible to make a profit. As further support for our conclusion that petitioners did not have a profit objective, the record contains several other unexplained inconsistencies that detract from petitioners' credibility. As one example, after respondent's counsel had suggested that petitioners chartered almost exclusively to people they knew, petitioner responded that he did not know Scott Vallerga prior to his charter in March of 1986. However, petitioner provided the IRS in 1987 with a list of "People Consulted", in which Vallerga appears as having been "consulted on selection *474 of boat and equipment for bareboat chartering in Channel Islands." Petitioner testified in connection with the list of all of the people "were consulted rather seriously." As another example of an inexplicably inconsistent record, we return to petitioner's change in employment from ARCO to Hughes Aircraft. He was involuntarily laid off in October 1984, which was supposedly well after petitioners had set in motion their chartering business plan. He then took a job with Hughes Aircraft in Long Beach, which by virtually any measure was much less favorable than ARCO to carrying on a remotely located business. Although petitioner appears, at first glance, to have made the best of an unfortunate and uncontrollable situation, his testimony is not otherwise consistent with that notion. Petitioner claimed that he and his wife initially planned to continue living in Glendale for 18 to 24 months after beginning their chartering business. At that point, the plan supposedly called for a move to Ventura, which would enable petitioner to devote more time to the business. Petitioner also testified that they chose their house in Glendale in early 1983 largely because of its ready marketability. *475 In reality, and not merely as a planning assumption, Nance Lewis could have worked for either the Santa Barbara office or the Ventura office of Coldwell Banker. Concerning his own plans for work, petitioner stated: I had the option in my plan of either working in the charter business full time, or finding a job with some other firm in that area. There are a number of industries that are both of a technical and business nature that are extremely sound businesses in that region. So, I really didn't have a limiting condition. I had the option of either going full time with the charter business and expanding the fleet to additional boats, or going to work full time for a company and still be able to manage the charter business. Given petitioners' fondness for the Ventura area, the geographical flexibility in Nance Lewis' work situation, the purported marketability of the Glendale house, petitioner's cut in pay and increase in hours at Hughes Aircraft, and his supposed lack of an employment "limiting condition" in Ventura, we cannot understand why petitioners, if indeed they had a profit objective, never relocated from Glendale. Based upon petitioner's testimony, we also have *476 serious misgivings about the 5-year cash-flow projections prepared by petitioner sometime in 1984. He testified that he prepared the projections in "early '84 at the latest", presumably to help persuade us that the business plan was settled upon even before petitioners committed to purchasing the sailboat. The projections include, however, $ 2,000 in annual revenue from Argonaut for the first 3 years. Petitioner denied at trial that the Argonaut sales agreement and the Argonaut charter agreement were a package deal, insisting instead that "I didn't broach the subject [of the charter agreement] to Argonaut until very late, well after I'd ordered the boat and placed a down payment with them". Petitioner did not explain how he was able to foretell the important terms of the charter agreement when he prepared his projections in "early '84". A more troubling aspect of the projections is the high level of charter fees needed for the first year of profitability. The "low case" shows its first profit in year 5 based upon 30 weeks of charter fees. The "mid case" shows its first profit in year 4 based upon 25 weeks of charter fees. Neither scenario shows a profit using the revenue assumption *477 of 10 charter weeks. Petitioner testified that he based his revenue projections upon data provided by SBSA and Calypso, which data he then discounted in order to be "very conservative". Yet he earlier testified that, based upon his knowledge at the time he was "looking closely into it", sailboat charters of 20 to 25 days a year were typical and would be a "very good return." [6] On cross-examination, without his projections in front of him, he surmised that about 30 charter days per year would be needed to show a profit. On brief, petitioners disregard the apparently unrealistic revenue projections: "The evidence showed that the normal expectation was for a relatively few actual charter days in that area, but the break-even only assumed about 30 days of charter use." On the subject of the pleasure boat insurance policy, petitioner maintained at trial that Mr. Christiansen said he could charter *478 Ta'te Tate' under the policy up to 10 days a year, as long as he either provided prior notification or had a valid charter agreement. The evidence does establish that Mr. Christiansen discussed charter implications with petitioner, but we do not believe that he made the statements attributed to him by petitioner. There was no explanation of the failure of petitioners to call Mr. Christiansen as a witness. We are, therefore, justified in concluding that his testimony would be unfavorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Bernard Deyette, current president of the insurance agency, testified credibly that a policy like petitioners' required a request for coverage for any upcoming charter, which United Pacific would either accept or deny in its sole discretion, or else a loss associated with the charter would not be covered. We also have no reason to doubt Mr. Deyette's testimony that Mr. Christiansen had the knowledge and ability to describe the policy accurately in terms of coverage and restrictions. Regarding the specific documentary evidence, Mr. Christiansen's *479 notes and those of petitioner are too sketchy to confirm that the 10-day arrangement applied to the pleasure boat policy, and the policy itself says nothing of the kind. Moreover, petitioner's statement that the retention of valid charter agreements was an acceptable alternative to prior notification lacks support even in his own notes. As we view the evidence, Mr. Christiansen's comments to petitioner about charter implications applied to policies other than the pleasure boat policy ultimately selected by petitioner. In addition to the already noted inconsistencies, the record is silent or underdeveloped in important areas. As mentioned in our earlier discussion of McLarney v. Commissioner, T.C. Memo. 1982-461, the extent of the noncharter usage of Ta'te Tate' was not established, contrary to petitioners' repeated assertions on brief. At trial, petitioner admitted that his records were deficient in this respect. Nance Lewis, for her part, refused even to hazard a guess as to the number of times petitioners took her real estate clients on sails. [7] Concerning pure pleasure trips, she said that the number was, simply, "Very few." She could not remember how *480 much time she spent promoting the chartering operation. Petitioners also did not establish with any precision how much total time they devoted to the chartering activity, nor how much money they spent on advertising. On this record, we have concluded that petitioners' sailboat chartering activity was not engaged in for profit within the meaning of section 183. Especially in view of petitioner's extensive and transferable business experience, they neither conducted the activity nor adapted to changed circumstances as we believe they would have if they had had an actual and honest objective of making a profit. Indeed, they appear to have been wholly uninterested in attracting charter clients who were not known to them. We note in closing our discussion of section 183 that many of the factors urged by petitioners *481 in support of their position are as much applicable to enjoyable personal use or hobby use as they are to a profit objective. Examples include an interest in careful maintenance of the boat and the thorough decision processes used to select a particular boat and harbor. Petitioners have not advanced any independent arguments for their claimed 1984 investment tax credit on the boat. Because petitioners did not engage in their boat chartering activity for profit under section 183, we agree with respondent that they are not eligible for the credit. Finoli v. Commissioner, 86 T.C. 697, 744 (1986). The parties have stipulated that the disputed issues concerning sales tax, self-employment tax, and the two-earner deduction will be adjusted in accordance with our resolution of the section 183 issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. After trial, the Court granted the motion of Shahen Hairapetian to withdraw as a counsel of record.↩
2. Unless otherwise indicated, section references are to the Internal Revenue Code as amended and in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The chartering of large sailboats is done on either a "crewed" or a "bare boat" basis. For a crewed charter, the charter party is provided with a licensed skipper and perhaps other crew members to operate and maintain the boat. In a bare boat charter, the charter party supplies its own skipper and thus takes direct responsibility for operation and maintenance.↩
4. Petitioners have not argued that, and we do not consider whether, some expenses associated with the boat are deductible as part of Nance Lewis' real estate activity.↩
5. For 1985 and 1986, the Commissioner allowed Schedule C interest on the sailboat purchase loan.↩
6. Petitioner's immediately subsequent comments make clear that he meant what he said, which is "days" instead of "weeks".↩
7. We do not agree with petitioners that entertainment of Nance Lewis' clients counts in their favor as ancillary "business" usage. The "business" under consideration in this case is the chartering activity.↩